IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| JOHN PRIEST, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 2:19-CV-004-D-BQ |
| | § | |
| LOGAN GRAZIER, MICHAEL | § | |
| FENWICK, and CITY OF AMARILLO, | § | |
| | § | |
| Defendants. | § | |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

Pursuant to a Standing Order of Reference, this case has been referred to the undersigned United States Magistrate Judge for pretrial management, including decisions as to non-dispositive matters and making findings and recommendations concerning dispositive matters. ECF No. 14. Before the court for recommendation is the City of Amarillo's (City) *Motion to Dismiss Plaintiff's Original Complaint for Failure to State a Claim Upon Which Relief can be Granted per Federal Rule of Civil Procedure 12(b)(6)*. ECF No. 10. For the reasons that follow, the undersigned recommends that the District Court **GRANT** the City's motion, and provide Priest the opportunity to amend his Complaint.

## I.   Background

On January 7, 2019, Plaintiff John Priest filed his original Complaint, asserting claims for violations under 42 U.S.C. § 1983, the Americans with Disabilities Act (ADA), and the Rehabilitation Act of 1973 (RA). Compl., at 6–12 (ECF No. 1). Priest names as Defendants the City and Amarillo Police Department (APD) Officers Logan Grazier and Michael Fenwick. *Id.* at 1. Priest's allegations stem from a January 9, 2017, incident involving Defendants Grazier and

1

Fenwick, in which Priest alleges Grazier and Fenwick used excessive force against him while he was incapacitated due to a diabetic episode. *See id.* at 2–7. Priest asserts a § 1983 claim against the City based on an alleged failure to adequately train its officers. *Id.* at 7–10. Priest also asserts claims under the ADA and RA, alleging that Defendants intentionally failed to accommodate his disabilities during the January 9 incident. *Id.* at 10–12. Priest seeks compensatory and exemplary damages. *Id.* at 12–14.

On February 12, 2019, the City filed the instant Motion to Dismiss and supporting brief. ECF Nos. 10, 11. The City seeks dismissal of Priest's municipal liability claim, arguing that he has not pleaded sufficient facts to support a claim based on its alleged failure to adequately train APD officers. Def., City of Amarillo, Brief-In-Support of Mot. to Dismiss Pl.'s Original Compl. for Failure to State a Claim, at 4–9 (ECF No. 11) [hereinafter Def.'s Br.]. Specifically, the City contends that Priest has not pleaded facts establishing the identity of a municipal policymaker who promulgated or ratified a "policy"—i.e., the City's alleged failure to train. *Id.* The City further claims that Priest's reliance on a single, isolated incident (i.e., the January 9 encounter with Defendants Grazier and Fenwick)—as opposed to a persistent, widespread pattern of conduct—cannot support a finding of deliberate indifference on the part of the City. *Id.* at 8–9. Moreover, the City argues that Priest has not shown a causal connection between any policy and the unconstitutional harm he allegedly suffered. *Id.* In addition, the City contends that Priest has not asserted any facts establishing a municipal liability claim based on an alleged failure to discipline APD officers. *Id.* at 9–10. The City also asserts that *Hainze v. Richards*, 207 F.3d 795 (5th Cir. 2000) forecloses Priest's ADA and RA claims because his pleadings demonstrate the existence of exigent circumstances. *Id.* at 10–12. Finally, the City avers that any claim for punitive damages

must be dismissed because Priest cannot recover punitive damages under the ADA and RA, and the City is immune from punitive damages under § 1983. *Id.* at 13.

Priest filed his response and brief in support on March 1, 2019 (ECF Nos. 16, 17), generally refuting the City's contentions with respect to his municipal liability claim. Priest concedes that he relies on a single incident—the January 9 encounter with APD officers—to establish liability, but argues that the need for training was so obvious that the City's failure to do so constitutes deliberate indifference. Pl.'s Br. In Support of Resp., at 12–13 (ECF No. 17) [hereinafter Pl.'s Resp.]. Priest claims that he "has not asserted a cause of action based on a failure to discipline," but that "the allegations concerning the failure to discipline are a component of the City's lack of concern for training officers." *Id.* at 14. With respect to his ADA and RA claims, Priest acknowledges that "courts in this district have largely followed" the *Hainze* holding, but argues that it does not apply at this juncture of the case. *Id.* at 14–15. Specifically, Priest claims the pleadings do not demonstrate "exigent circumstances"—a necessary element for the *Hainze* holding to apply. *Id.* at 15. Moreover, Priest points out that because *Hainze* was decided at summary judgment, the City's argument "should be reserved for summary judgment" and is inapplicable to a Rule 12(b)(6) decision. *Id.* at 15–16. Priest also argues that, in the alternative, he has pleaded facts supporting the necessary elements of an ADA and RA claim. *Id.* at 16–18.

On March 10, 2019, the City filed its reply, reiterating that with respect to Priest's municipal liability claim, Priest has not alleged any facts identifying a policymaker, nor has he shown that the January 9 incident was a "'highly predictable' consequence of a failure to train" and that the failure to train was the "moving force" behind the constitutional violation. Def., City of Amarillo's, Reply to Pl.'s Resp. to the City of Amarillo's Mot. to Dismiss Pl.'s Original Complaint for Failure to State a Claim, at 2–6 (ECF No. 18) [hereinafter Def.'s Reply]. The City

also asserts that even if *Hainze* does not apply, "[Priest's] ADA and RA claims fail because the Complaint never alleges plausible facts that Defendant officers knew that Priest was an individual with an alleged disability or that Priest was subject to intentional discrimination." *Id.* at 8–9. The City's Motion is now ripe for review.

## II.   Standard of Review

To survive a Rule 12(b)(6) motion, a plaintiff must allege sufficient facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see Colony Ins. Co. v. Peachtree Constr., Ltd.*, 647 F.3d 248, 252 (5th Cir. 2011). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In considering 12(b)(6) motions, courts must accept well-pleaded facts (not mere conclusory allegations) as true and view them in the light most favorable to the plaintiff. *Twombly*, 550 U.S. at 471 (explaining that a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do"); *Snow Ingredients, Inc. v. SnoWizard, Inc.*, 833 F.3d 512, 520 (5th Cir. 2016) (quoting *Iqbal*, 556 U.S. at 678) (stating that courts accept all well-pleaded facts as true, but "'[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements' cannot establish facial plausibility").

The court may also consider exhibits attached to the complaint, including video evidence, in deciding a motion to dismiss. *See* Fed. R. Civ. P. 10(c) (providing that "[a] copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes"); *Hartman v. Walker*, 685 F. App'x 366, 368 (5th Cir. 2017) (citing *Villarreal v. Wells Fargo Bank, N.A.*, 814 F.3d 763, 766 (5th Cir. 2016)) (explaining that a court "is entitled to consider any exhibits attached to the complaint, including video evidence"); *Griffin v. City of Sugar Land*, Civil Action No. H-

18-3121, 2019 WL 175098, at *2 (S.D. Tex. Jan. 11, 2019) (citing several cases for support) (acknowledging that the court may consider body camera video attached to plaintiff's amended complaint and incorporated by reference).   In this regard, a court need not "favor plaintiff's allegations over the video evidence." *Hartman*, 685 F. App'x at 368; *see Griffin*, 2019 WL 175098, at *2. "The standard for adopting video evidence over a plaintiff's allegations is, nevertheless, 'a demanding one: a court should not discount the nonmoving party's story unless the video evidence provides so much clarity that a reasonable jury could not believe his account.'" *Griffin*, 2019 WL 175098, at *2 (quoting *Scott v. White*, No. 1:16-CV-1287-RP, 2018 WL 2014093, at *1 (W.D. Tex. Apr. 30, 2018)).

A court need only determine whether the plaintiff has stated a legally cognizable claim; it does not evaluate whether the plaintiff is ultimately likely to prevail. *See United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004). "The court may dismiss a claim when it is clear that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999) (citing *Fee v. Herndon*, 800 F.2d 804, 807 (5th Cir. 1990)).

### III.   Priest's Factual and Legal Allegations

Priest alleges that on January 9, 2017, he stopped his car in the middle of the road because he was suffering from a diabetic episode.   Compl., at 2 ¶¶ 6–7.   Priest asserts that sometime thereafter, Defendant Grazier stopped his patrol vehicle behind Priest's vehicle, approached the driver's side door, and attempted to make contact with Priest.   *Id.* ¶ 8.   Defendant Fenwick then arrived and both officers continued making attempts to speak with Priest.   *See id.* at 3, ¶¶ 13–14. According to Priest, he was unable to communicate with Defendants or comply with their requests to open his door or window due to his medical emergency.   *Id.* ¶ 14.   Because Priest did not roll

down his window to speak with Defendants, Priest avers that Defendant Grazier used his department-issued ASP baton to shatter the back driver's side window. *Id.* ¶ 15. Priest asserts that "Defendants Grazier and Fenwick then aggressively pulled [him] out of his vehicle by grabbing the back of his neck and forcing his body onto the pavement that was covered with the shards of glass from his broken window." *Id.* ¶ 18. Priest alleges "Defendant Fenwick forced his right knee onto the back of Mr. Priest's head," and "multiple times" Fenwick "picked up his left knee allowing the right knee to bear all of his weight on the back of Mr. Priest's neck and head." *Id.* ¶ 20. Priest further asserts that both Defendants "struck [him] multiple times," and after Defendants handcuffed him and called an ambulance, "Defendant Grazier can be seen rolling Mr. Priest over and delivering a knee strike to Mr. Priest's lower back, which rendered him limp on the glass covered pavement." *Id.* at 4, ¶¶ 23–26. Priest alleges that "[a]t no time did [he] threaten either Defendant Grazier or Defendant Fenwick, nor was [he] capable of making a threat." *Id.* ¶ 30. He specifically contends that "[t]hroughout the encounter, Mr. Priest's hands can be seen above his head." *Id.* at 3, ¶ 17.[1] Priest claims that as a result of the January 9 incident, he suffered pain and "numerous lacerations to his head and face, which required stitches and left permanent scarring and disfigurement." *Id.* at 4, ¶ 31. He further asserts that he "has been diagnosed with Post Traumatic Stress Disorder as a result of Defendants [sic] egregious conduct." *Id.* at 5, ¶ 32.

Based on the foregoing allegations, Priest avers that "[t]he amount of force [Defendants Grazier and Fenwick] used on [him] violated his rights against unreasonable seizures under the Fourth Amendment of the United States Constitution." *Id.* ¶ 40. Priest further alleges that

---

[1] In support of his allegations, Priest attaches as Exhibit A to his original Complaint a copy of "Defendant Grazier's dash camera video . . . ." Compl., at 2 n.1. The court notes that while the events depicted therein generally track the timeline of events as described by Priest, the video explicitly demonstrates that Plaintiff did not maintain his hands above his head during the entire interaction. Instead, Plaintiff only raised his hands for brief periods of time.

"Defendants Grazier and Fenwick, due to a lack of proper training, erroneously assumed that [he] was under the influence of narcotics, and, as such, treated him accordingly." *Id.* ¶ 36. This erroneous assumption, Priest contends, is the result of the City's failure to adequately train its officers to distinguish between medical and drug-induced emergencies. *Id.* ¶¶ 33, 36. Priest claims that this failure to train caused Defendants Grazier and Fenwick to not recognize and "attend to the medical needs of [Priest], and instead resort[] to excessive force, [resulting in Priest's] further injury." *Id.* at 8–9, ¶¶ 51, 57. Finally, Priest asserts that the City violated his rights under the ADA and RA. *Id.* at 11–12.

## IV.   Analysis

The City seeks dismissal of Priest's claims, arguing that he has failed to allege facts supporting a viable: (1) § 1983 municipal liability claim; and (2) claim under the ADA and RA.

### A.  Priest has not stated an actionable § 1983 municipal liability claim against the City.

The City contends that Priest has not adequately stated a municipal liability claim because he has not alleged plausible facts demonstrating the City failed to properly train its officers.[2] *See* Def.'s Br., at 4–9. Specifically, the City argues that Priest's "Complaint wholly fails to allege with plausible facts a policymaker who made a deliberate choice to follow a course of action that allegedly caused the Plaintiff's injuries." Def.'s Reply, at 3; *see* Def.'s Br., at 5 (asserting that Priest's allegations against the City "do[] not identify a policymaker with the authority to authorize such an alleged [failure to train] or any specific facts indicating actual or constructive knowledge of such an alleged practice so as to attribute the practice to the City . . ."), 9 ("The Complaint also fails to state a claim related to a failure to train because it is wholly devoid of any factual allegations

---

[2] The City also separately asserts that Plaintiff has not established a municipal liability claim based on any alleged failure to discipline its police officers. Def.'s Br., at 9–10. In his response, however, Plaintiff states that he "has not asserted a cause of action based on a failure to discipline." Pl.'s Resp., at 14. The court therefore does not address this issue.

that identify a policymaker with knowledge of the alleged offending custom, must less how the custom caused the Plaintiff's alleged injuries."). The City further argues that Priest has not: (1) pleaded sufficient facts to support a finding that the City was deliberately indifferent in failing to adopt a training policy; and (2) established a causal connection between the City's alleged failure to train and Priest's constitutional harm. *Id.* at 7–9. Based on these alleged deficiencies, the City argues that Priest cannot state a municipal liability claim. *See* Def.'s Reply, at 2–5.

"A municipality is a 'person' subject to suit under Section 1983." *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 166 (5th Cir. 2010) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978)). A municipality cannot, however, "be held liable under § 1983 on a respondeat superior theory." *Monell*, 436 U.S. at 691. Instead, "the unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur; isolated unconstitutional actions by municipal employees will almost never trigger liability." *Piotrowski v. City of Hous.*, 237 F.3d 567, 578 (5th Cir. 2001). Thus, a plaintiff may sue a municipality if it is alleged to have violated plaintiff's constitutional rights through an official policy or "governmental custom, even if such custom has not received formal approval." *Zarnow*, 614 F.3d at 166 (internal quotations and citations omitted).

To establish municipal liability under § 1983, a plaintiff must demonstrate the following elements: (1) a policymaker; (2) an official policy; and (3) a violation of plaintiff's constitutional rights "whose 'moving force'" is the policy or custom.[3] *Piotrowski*, 237 F.3d at 578 (quoting

---

[3] As an initial matter, a plaintiff must also allege an underlying constitutional violation to state a successful municipal liability claim. *See Hicks-Fields v. Harris Cty.*, 860 F.3d 803, 808 (5th Cir. 2017) (quoting *Kitchen v. Dall. Cty.*, 759 F.3d 468, 484 (5th Cir. 2014)) ("As is well established, every *Monell* claim requires 'an underlying constitutional violation.'"); *see James v. Harris Cty.*, 577 F.3d 612, 617 (5th Cir. 2009) (citing *Piotrowski*, 237 F.3d at 578) (explaining that to establish municipal liability, a plaintiff must, *inter alia*, demonstrate a constitutional violation). Here, Priest has asserted Defendants Grazier and Fenwick violated his constitutional rights by allegedly using force excessive to the need. *See* Compl., at 5 ¶¶ 38, 40, 6–7. The City does not challenge the adequacy of Priest's pleadings with respect to the underlying constitutional violation; thus, the court does not consider their sufficiency.

*Monell*, 436 U.S. at 694); *see Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009) (citing *Piotrowski*, 237 F.3d at 578). The Fifth Circuit has explained that the three elements "must not be diluted, for '[w]here a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into respondeat superior liability.'" *Snyder v. Trepagnier*, 142 F.3d 791, 796 (5th Cir. 1998) (quoting *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 415 (1997)).

In this case, Priest does not contend that the City maintains a formal written policy. *See* Compl., at 8–10. Instead, he asserts that the City's failure to train APD officers to recognize the difference "between medical emergencies and symptoms of narcotics use" constitutes a "policy" for which the City may be liable. Compl., at 8 ¶ 51.

Generally, a plaintiff must identify a policy that, when executed, caused him to suffer a constitutional injury. *Monell*, 436 U.S. at 694. In limited circumstances, however, a plaintiff's allegation that a municipality failed to train its employees "may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury." *City of Canton v. Harris*, 489 U.S. 378, 387, 390 (1989); *see Hobart v. City of Stafford*, 784 F. Supp. 2d 732, 750 (S.D. Tex. 2011) (quoting *City of Canton*, 489 U.S. at 389) (explaining that a city's failure to train its employees may constitute a "policy" in narrow instances). As the Supreme Court explained in *City of Canton*:

> It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.

*City of Canton*, 489 U.S. at 389.  It is "[o]nly where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality," however, that "a city [may] be liable for such a failure [to train] under § 1983." *Id.*

Where the "policy" concerns an alleged failure to train employees, a plaintiff must demonstrate that "(1) the training or hiring procedures of the municipality's policymaker were inadequate, (2) the municipality's policymaker was deliberately indifferent in adopting the hiring or training policy, and (3) the inadequate hiring or training policy directly caused the plaintiff's injury." *Conner v. Travis Cty.*, 209 F.3d 794, 796 (5th Cir. 2000) (quoting *Baker v. Putnal*, 75 F.3d 190, 200 (5th Cir. 1996)); *see Peña*, 879 F.3d at 623 (quoting *Thompson v. Upshur Cty.*, 245 F.3d 447, 459 (5th Cir. 2001)).  Under the second element, "[d]eliberate indifference is more than mere negligence." *Conner*, 209 F.3d at 796 (citing *Rhyne v. Henderson Cty.*, 973 F.2d 386, 392 (5th Cir. 1992)).  "Deliberate indifference is a stringent standard, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Valle v. City of Hous.*, 613 F.3d 536, 547 (5th Cir. 2010) (quoting *Brown v. Bryan Cty.*, 219 F.3d 450, 457 (5th Cir. 2000)). Generally, a plaintiff must establish "[a] pattern of similar constitutional violations by untrained employees" to show deliberate indifference.  *Peña*, 879 F.3d at 623–24 (quoting *Connick v. Thompson*, 563 U.S. 51, 62 (2011)); *see Burge v. St. Tammany Par.*, 336 F.3d 363, 370 (5th Cir. 2003) (quoting *Thompson*, 245 F.3d at 459) (noting that "proof of deliberate indifference[] generally requires a showing 'of more than a single instance of the lack of training or supervision causing a violation of constitutional rights'"); *see also Fraire v. City of Arlington*, 957 F.2d 1268, 1278 (5th Cir. 1992) ("Allegations of an isolated incident are not sufficient to show the existence of a custom or policy.").  A single incident may, however, supply the requisite deliberate indifference where the constitutional violation is a "highly predictable consequence" of the failure

10

to train. *Kitchen*, 759 F.3d at 484, *abrogated on other grounds by Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015). Nevertheless, the Fifth Circuit "has been highly reluctant to permit this [single-incident] exception to swallow the rule that forbids mere respondeat superior liability." *Roberts v. City of Shreveport*, 397 F.3d 287, 295 (5th Cir. 2005) (citing several cases for support).

As set forth below, the court finds that Priest has not pleaded plausible facts establishing a municipal liability claim under the failure-to-train theory.

### *1. Priest has not pleaded any facts showing ratification or promulgation of a policy.*

The City first contends that Priest's Complaint does not plausibly identify "a policymaker with the authority to authorize such an alleged practice or any specific facts indicating actual or constructive knowledge of such an alleged practice so as to attribute the practice to the City . . . ." Def.'s Br., at 5. Under 12(b)(6) analysis, "a plaintiff is not required to single out the specific policymaker in his complaint." *Groden v. City of Dall.*, 826 F.3d 280, 282 (5th Cir. 2016). This is because "the specific identity of the policymaker is a legal question that need not be pled." *Id.* at 284. Therefore, a plaintiff need only "plead *facts* that show that the defendant or defendants acted pursuant to a specific official policy, which was promulgated or ratified by the legally authorized policymaker" and "under which the municipality is said to be liable."[4] *Id.* at 282, 284 (emphasis in original). Where, as here, the Rule 12(b)(6) movant challenges the policymaker element of a municipal liability claim, the court must determine whether the plaintiff "has pled facts that, read in the light most favorable to [the plaintiff], show that the statutorily authorized policymaker promulgated an unconstitutional policy." *Id.* at 285; *see also Peña*, 879 F.3d at 623

---

[4] As the Fifth Circuit noted in *Groden*, a plaintiff must nevertheless "name the *entity* that acted under the policy . . . as a defendant. This level of identification is fundamental." 826 F.3d at 284 n.4. In this case, Priest has appropriately named the City of Amarillo.

(quoting *Hicks-Fields*, 860 F.3d at 808) ("A city cannot be liable for an unwritten custom unless '[a]ctual or constructive knowledge of such custom' is attributable to a city policymaker." ).

In *Groden*, the plaintiff alleged that the city's official spokesperson publicly announced the policy that plaintiff alleged caused him harm. 826 F.3d at 286. The Fifth Circuit found that based on this allegation, the plaintiff had sufficiently pleaded facts—for the purpose of overcoming a Rule 12(b)(6) motion—showing that the city policymaker promulgated or ratified the policy, even though plaintiff had not specifically identified the policymaker. *See id.* In this case, unlike in *Groden*, Priest has not "show[n] that the city [policymaker] promulgated or ratified the challenged policy." *Id.* Priest's Complaint alleges the following:

> The City of Amarillo lacks training that ultimately causes officers to not only fail to differentiate between medical emergencies and symptoms of narcotics use, but to inevitably show deliberate indifference to the medical needs of those taken into custody like Plaintiff in this case. The City of Amarillo tolerates this inadequate training and supervision system that allows Amarillo police officers to escape investigation and discipline for their deliberate indifference to necessary medical care of those that have been detained by reason of the officers assuming ingestion of illegal narcotics instead of medical emergency.

> Defendant City of Amarillo was aware that officers would be likely to encounter the same or similar situations as this and that the subjects would be placed in danger if officers were unable to differentiate between medical emergencies and criminal activity, which leads to them being deliberately indifferent to the subject's medical needs. Despite that awareness, the City took no steps to adequately educate or train officers on how to handle situations such as this
> . . . .

> The City of Amarillo does not train or implement policy that police as first responders should react with restraint to persons with disabilities. Additionally, the City of Amarillo was deliberately indifferent and reckless in allowing the indiscriminate use and over-use of force and failure to adequately train officers in use of force, as first responders dealing with medical emergencies.

> The City of Amarillo knew or should have known at the time of the occurrence that this was a situation which its officers would have to deal with on a regular basis. Similarly, City of Amarillo knew or should have known that this situation had the real potential for injury and/or serious harm to a citizen.

Compl., at 8–9 ¶¶ 51, 57–59.  The foregoing allegations do not include any facts demonstrating any actions by City policymakers ratifying or promulgating an unconstitutional "policy"—i.e., the alleged failure to train.  *See id.* at 8–10.  Instead, "[Priest's] complaint invites no more than speculation that any particular policymaker, be it the chief of police or the city commission, knew about the alleged [failure to train]."  *Peña*, 879 F.3d at 623.  Even accepting Priest's well-pleaded facts as true and in a light most favorable to him, he has not identified any actions by a City policymaker that the court can fairly construe as ratification or promulgation of the alleged failure to train.  *See, e.g.*, *Jones v. City of Mesquite*, Civil Action No. 3:18-CV-0177-B, 2018 WL 3853714, at *3–7 (N.D. Tex. July 25, 2018) (finding plaintiff's allegation that city policymakers "developed and maintained a policy of deficient training of its police force in the use of force, including the proper use of force and detentions, and apprehension of individuals" did not adequately demonstrate, under Rule 12(b)(6), that a policymaker promulgated or ratified an unconstitutional policy as required by *Groden*), *R. & R. adopted*, 2018 WL 3845415, at *1 (Aug. 13, 2018); *Kremelberg v. Keeling*, Civil Action No. 3:15-CV-3695-K-BH, 2016 WL 7744408, at *8 (N.D. Tex. Dec. 12, 2016) (explaining that plaintiff's allegation that the city's "formal and informal actions in failing to recognize, covering-up and/or tacitly encouraging unconstitutional and unlawful actions by police, reflect a policy & procedure, custom and practice, of authorizing and allowing the use of excessive force and unreasonable search and seizure that violated the civil rights of [plaintiff]" did not provide sufficient facts from which the court could reasonably conclude a city policymaker ratified the alleged unconstitutional conduct); *see also Pierce v. Kaufman Cty. Dist. Attorney's Office*, No. 3:16-CV-2554-G-BH, 2018 WL 5624195, at *6–7 (N.D. Tex. Sept. 27, 2018) (stating that plaintiff's reliance on the conduct of individual defendants could not establish municipal liability and instead amounted to a claim for vicarious liability, where

13

plaintiff's "mere conclusory statements [were] devoid of any facts that establish[ed] any involvement by the County or its policymakers"). Accordingly, the court should dismiss Priest's municipal liability claim on this ground.

### 2. *Priest has not pleaded plausible facts demonstrating that the City failed to adequately train APD officers.*

Priest premises his municipal liability claim on his contention that the City did not train its APD officers to recognize the difference "between medical emergencies and symptoms of narcotics use." Compl., at 8 ¶ 51. As stated above, to successfully plead a failure-to-train claim, a plaintiff must demonstrate that: (1) the city's training was inadequate; (2) the city's failure to train constituted deliberate indifference to plaintiff's constitutional rights; and (3) there is a causal connection between the failure to train and the plaintiff's constitutional injury. *See Peña*, 879 F.3d at 623; *Conner*, 209 F.3d at 796.

Initially, the court observes that the City only cursorily challenges Priest's allegations with respect to the adequacy of the City's training. *See* Def.'s Br., at 13 (contending that "Plaintiff's Complaint makes vague assertions concerning 'inadequate training,'" but providing no further elaboration or argument). The court nevertheless examines this necessary element. "[A] plaintiff must allege with specificity how a particular training program is defective." *Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir. 2005); *see Zarnow*, 614 F.3d at 170. "Vague assertions regarding the need for 'better or more training' [are] insufficient for a constitutional failure to train claim." *Backe v. City of Galveston*, 2 F. Supp. 3d 988, 1007 (S.D. Tex. 2014) (quoting *City of Canton*, 489 U.S. at 391). A plaintiff can generally satisfy the first element of a failure to train claim—i.e., the inadequacy of the training—"by alleging facts related to the locality's actual training program." *Speck v. Wiginton*, 606 F. App'x 733, 736 (5th Cir. 2015) (citing cases for support).

14

Here, Priest fails to identify any specific deficiencies regarding the City's actual training of its officers. *See* Compl., at 8 ¶ 51 ("The City of Amarillo lacks training that ultimately causes officers to . . . fail to differentiate between medical emergencies and symptoms of narcotics use."), ¶ 55 ("As a direct result of the city of Amarillo's failure to adequately train, Amarillo police officer's [sic] show an inability (or conscious decision) not to take into account medical emergencies when dealing with members of the community."). These conclusory allegations assert the absence of training with respect to recognizing medical conditions, but notably, they do not provide any specific facts regarding the City's training—for example, facts showing *how* the City's training program was deficient or the content of the City's training program. The only facts Priest provides in support of the alleged inadequate training are the acts of Defendants Grazier and Fenwick on January 9. "[Priest] is thus asking [this court] to make the inference that a single alleged incident of misconduct means officers are inadequately trained." *Speck*, 606 F. App'x at 737. Drawing such an inference, however, "is at odds with the law against *respondeat superior* liability in section 1983 cases, which is a rule premised on the common sense proposition that officer misconduct is often a result of the independent decisions of officers rather than direction from superiors." *Id.*; *see Roberts*, 397 F.3d at 293 ("Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal."). Because Priest does not plead any facts showing the particular deficiencies in the City's training, he has not established the first failure-to-train element. *See, e.g.*, *Gallaher v. City of Maypearl*, Civil Action No. 3:17-CV-1400-M, 2018 WL 700252, at *6 (N.D. Tex. Feb. 2, 2018) (citing *Speck*, 606 F. App'x at 737) (dismissing plaintiff's failure to train claim in part because plaintiff did "not point to a specific training program or identify what training or supervision should have occurred to

15

prevent the allegedly unconstitutional actions of" defendants); *Gaynier v. Hudson*, Civil Action No. 3:16-CV-2314-D-BK, 2017 WL 6626347, at *3 (N.D. Tex. Nov. 16, 2017) (citing *E.G. v. Bond*, Civil Action No. 1:16-CV-068-C, 2017 WL 129019, at *4 (N.D. Tex. Jan. 13, 2017)) ("Absent factual enhancement, Plaintiff's allegations amount to little more than a claim that the City generally failed to train its police force, which is legally inadequate.").

Moreover, Priest has not pleaded facts demonstrating deliberate indifference on the part of the City. Priest does not allege that the City's failure to train has resulted in a pattern of similar violations. Instead, Priest "relies on [a] single incident to establish liability." Pl.'s Resp., at 17. Specifically, he alleges that the January 9, 2017, incident, standing alone, suggests deliberate indifference by the City. *See id.* at 12–13; *see also* Compl., at 9–10 ¶¶ 57–61. According to Priest, the City's failure to adequately train its officers resulted in his harm. *See* Compl., at 8–10 ¶¶ 54–55, 57, 61. In support of his claim, Priest alleges that:

> Defendant City of Amarillo was aware that officers would be likely to encounter the same or similar situations as this and that the subjects would be placed in danger if officers were unable to differentiate between medical emergencies and criminal activity, which leads to them being deliberately indifferent to the subject's medical needs. Despite this awareness, the City took no steps to adequately educate or train officers on how to handle situations such as this
> . . . .

> The City of Amarillo knew or should have known at the time of the occurrence that this was a situation which its officers would have to deal with on a regular basis. Similarly, City of Amarillo knew or should have known that this situation had the real potential for injury and/or serious harm to a citizen.

*Id.* at 9 ¶¶ 57, 59; *see* Pl.'s Resp., at 12–13. The City argues that this single incident cannot plausibly establish the requisite deliberate indifference on its part. Def.'s Br., at 7–9; Def.'s Reply, at 6–7. The court agrees.

Priest attempts to fit his pleadings into the holding of *City of Canton*, where the Supreme Court first articulated the single-incident exception. In *City of Canton*, the Supreme Court

16

explained that where "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, . . . the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."   489 U.S. at 390; *see also Bryan Cty.*, 520 U.S. at 409 (explaining that "municipal liability could be triggered by evidence of a single violation of federal rights, accompanied by a showing that the municipality has failed to train its employees to handle recurring situations presenting an *obvious* potential for such a violation"—i.e., the violation is a "highly predictable consequence of the failure to train" (emphasis added)).   The Court further illustrated the single-incident exception through a hypothetical:

> [C]ity policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force, can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.
>
> It could also be that the police, in exercising their discretion, so often violate constitutional rights that the need for further training must have been plainly obvious to the city policymakers, who, nevertheless, are "deliberately indifferent" to the need.

*City of Canton*, 489 U.S. at 390 n.10 (internal citations omitted).  The Court cautioned lower courts, however, against broadly interpreting the exception. *See id.* at 391–92. "In resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform," and "the identified deficiency in a city's training program must be closely related to the ultimate injury." *Id.* at 390–91.  This is because "single-incident liability is predicated on (1) the likelihood that a police officer will be confronted with a specific situation and (2) the predictability that an officer, when confronted with that situation, will violate a person's

constitutional rights." *Davis v. City of Montgomery*, 220 F. Supp. 3d 1275, 1284 (M.D. Ala. 2016) (citing *Bryan Cty.*, 520 U.S. at 409).

Distilled to its essence, Priest's position is that the need for training was obvious and that his alleged January 9 injuries were a highly predictable consequence of the City's failure to train officers to distinguish between "medical emergencies and criminal activity." Compl., at 9 ¶ 57. Priest does not, however, provide any plausible facts to support this conclusory allegation. *See id.* ¶¶ 57, 59. Based on this single incident, the court "[could] reasonably expect—if the need for training in this area was 'so obvious' and the failure to train was 'so likely to result in the violation of constitutional rights'—that [Priest] would be able to identify other instances of harm arising from the failure to train. The fact that [he] d[oes] not do so undercuts [his] deliberate indifference claim." *Conner*, 209 F.3d at 797. Priest does not point to any specific facts identifying other instances of similar harm, nor does he plead facts showing a likelihood that the City's failure to train officers to distinguish between medical emergencies and narcotics use would result in officers using excessive force. In short, Priest has not adequately demonstrated that "'the highly predictable consequence of [the City] not training' its officers was that [the officers] 'would apply force in such a way that the Fourth Amendment rights of [citizens] were at risk.'" *Peterson*, 588 F.3d at 849 (quoting *Brown*, 219 F.3d at 461).

Lastly, the City also challenges Priest's allegations with respect to the causal connection between the alleged failure to train and the claimed constitutional violation. *See* Def.'s Br., at 13 (alleging that Priest's "Complaint . . . is wholly devoid of any factual allegations that identify . . . how the custom caused the Plaintiff's alleged injuries"). After reviewing the Complaint, the court agrees and finds that Priest has not pleaded plausible facts demonstrating that any alleged deficiency in the City's training program "was the 'cause' of constitutional injury . . . ." *City of*

18

*Canton*, 489 U.S. at 394 (O'Connor, J., concurring in part).  Priest must allege facts showing a "direct causal link"—not merely an indirect link—"between a municipal policy or custom and the alleged constitutional deprivation." *Id.* at 385.  The alleged constitutional deprivation in this case is injury resulting from Defendants' excessive use of force.  Priest does not plead specific facts showing that the City's failure to train its officers to differentiate between drug-induced incapacity and a medical emergency is "closely related to" Priest's injuries resulting from the alleged use of force.  *See id.* at 390–91; *see, e.g.*, *Bonner v. City of Sweeny*, Civil Action No. 3:18-CV-00101, 2018 WL 6202268, at *5 (S.D. Tex. Nov. 8, 2018) (recommending dismissal of plaintiff's municipal liability claim in part because his conclusory allegation that the city failed to train its officers, proximately causing his injury, did not plausibly state a claim); *Jones*, 2018 WL 3853714, at *1–2, *7 (finding plaintiff failed to plead any facts supporting allegation that city's failure to train was the moving force behind plaintiff's injuries, where plaintiff's claim that officer wrongfully shot him three times because the city did not train officers regarding the proper use of force were "too vague and conclusory to support the causation element").  As pleaded, Priest's allegations fail to meet the "rigorous" and "stringent" causation requirements.  *Snyder*, 142 F.3d at 799.

   "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).  The court finds that, at this juncture, Priest has not pleaded adequate facts establishing a municipal liability claim against the City based on its alleged failure to train APD officers.  Accordingly, the undersigned recommends that Priest's failure-to-train claim be dismissed for failure to state a claim.  *See Twombly*, 550 U.S. at 555.

**B. Priest has not sufficiently pleaded facts establishing a claim under the ADA or RA.**

Priest seeks relief against the City under Title II of the ADA and Section 504 of the RA. *See* Compl., at 10–12. He asserts that "[i]nstead of accommodating [his] needs, City of Amarillo denied [him] adequate medical services and programs available to others that would have prevented his injury." *Id.* at 12 ¶ 76. Priest further contends that the City's "failure to accommodate [his] disabilities was intentional and/or deliberately indifferent to [his] rights under Section 504 [of the RA] and Title II of the ADA and was the proximate cause of his injury." *Id.* ¶ 77.

Through its motion to dismiss, the City argues that Priest's claims are foreclosed by the Fifth Circuit's holding in *Hainze v. Richards*, which generally precludes recovery where exigent circumstances exist. Def.'s Br., at 10. Alternatively, the City contends that Priest has not alleged "plausible facts that Defendant officers knew that Priest was an individual with an alleged disability or that Priest was subjected to intentional discrimination." Def.'s Reply, at 8.

Title II of the ADA, which applies to public entities such as the City, provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; *see* § 12131(1)(A)–(B) (defining a public entity to include "any State or local government" and "any department, agency . . . or other instrumentality of a State or States or local government"). "Title II imposes an obligation on public entities to make reasonable accommodations or modifications for disabled persons, including prisoners." *Garrett v. Thaler*, 560 F. App'x 375, 382 (5th Cir. 2014) (citing *Tennessee v. Lane*, 541 U.S. 509, 531 (2004) and *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 213 (1998)). To state a claim under Title II of the ADA, a plaintiff must demonstrate: "(1) that he has

a qualifying disability; (2) that he is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) that such discrimination is by reason of his disability." *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011) (citing *Melton v. Dall. Area Rapid Transit*, 391 F.3d 669, 671–72 (5th Cir. 2004)). A qualifying disability is "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A).

The RA similarly provides that a disabled individual shall not "solely by reason of her or his disability . . . be denied the benefits of . . . any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). "To state a claim for relief under the RA, a plaintiff must allege: '(1) the existence of a program or activity within the state which receives federal financial assistance; (2) the plaintiff is an intended beneficiary of the federal assistance; and (3) the plaintiff is a qualified handicapped person, who solely by the reason of her handicap has . . . been denied benefits from, or otherwise been subject to discrimination under such program or activity.'" *Hay v. Thaler*, 470 F. App'x 411, 417–18 (5th Cir. 2012) (quoting *Melton*, 391 F.3d at 676 n.8).

The Fifth Circuit has recognized that "[j]urisprudence interpreting either [the ADA or RA] is applicable to both." *Hainze*, 207 F.3d at 799. This is because "the rights and remedies afforded plaintiffs under Title II of the ADA are almost entirely duplicative of those provided under § 504 of the Rehabilitation Act." *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005). The causation requirements for the ADA and RA differ, however, in that the RA proscribes discrimination "solely by reason of" disability, where the ADA states that "discrimination need not be the sole reason" for the denial of benefits. *Id.* Under the ADA and RA, a plaintiff must show intentional discrimination to recover compensatory damages. *Delano-Pyle v. Victoria Cty.*, 302 F.3d 567, 574 (5th Cir. 2002).

In *Hainze*, the Fifth Circuit considered whether the ADA and RA apply to a claim based on a public entity's failure to train police officers how to reasonably accommodate an arrestee's disability.[5]  207 F.3d at 800.  The defendant police officers in *Hainze* responded to a 9-1-1 call from a woman requesting that police transport her suicidal nephew, Hainze, to a hospital for mental health treatment.  *Id.* at 797.  Hainze's aunt advised police that "Hainze had a history of depression and was under the influence of alcohol and anti-depressants, carrying a knife, and threatening to commit suicide or 'suicide by cop.'"  *Id.*  Upon arrival at the scene, the officers observed Hainze standing at the passenger side of an occupied pickup truck and holding a knife.  *Id.*  After officers ordered Hainze to step away from the vehicle, Hainze responded with profanities and began advancing toward the officers.  *Id.*  Hainze did not stop his advance, despite orders from the officers, and "[w]hen Hainze was within four to six feet [an officer] fired two shots in rapid succession into Hainze's chest."  *Id.*

Hainze argued that the county did not reasonably accommodate his disability by "failing to adopt or enforce policies to adequately handle individuals who are mentally ill and in crisis situations, and to protect against the use of excessive and deadly force in such situations."  *Id.*  The Fifth Circuit held, however, that "Title II [of the ADA] does not apply to an officer's on-the-street responses to reported disturbances or other similar incidents, whether or not those calls involve subjects with mental disabilities, prior to the officer's securing the scene and ensuring that there is no threat to human life."  *Id.* at 801.  The court explained its holding as follows:

---

[5] In *Hainze*, the Fifth Circuit explained that there are two theories under which an arrestee may bring a Title II claim— "wrongful arrest" and "reasonable accommodation."  207 F.3d at 800.  The court discussed the exigent circumstances exception within the context of the plaintiff's claim that the defendant failed to reasonably accommodate his disability.  *Id.* at 800–01.  Here, Priest similarly contends that the City failed to reasonably accommodate his disability but argues that *Hainze* does not apply because there were no exigent circumstances in this instance.  *See* Compl., at 12 ¶¶ 76–77; Pl.'s Resp., at 14–16.  As discussed herein, the court finds the exigent circumstances exception applies to the facts as pleaded.

> Law enforcement personnel conducting in-the-field investigations already face the onerous task of frequently having to instantaneously identify, assess, and react to potentially life-threatening situations. To require the officers to factor in whether their actions are going to comply with the ADA, in the presence of exigent circumstances and prior to securing the safety of themselves, other officers, and any nearby civilians, would pose an unnecessary risk to innocents. While the purpose of the ADA is to prevent the discrimination of disabled individuals, we do not think Congress intended that the fulfillment of that objective be attained at the expense of the safety of the general public.

*Id.* After the immediate threat is subdued and officers have secured the area, the court noted, public entities have a duty to reasonably accommodate an arrestee's disability in managing and transporting him. *Id.* at 802.

Priest asserts that *Hainze*, a case decided at the summary judgment stage, does not apply when the court is deciding a Rule 12(b)(6) motion. Pl.'s Resp., at 15.   According to Priest, the facts, when viewed most favorably to him, "establish that there were no exigent circumstances," he "was suffering a medical emergency," and "he posed no threat to any police officer or to any civilian in the vicinity." *Id.* at 15–16.  The court again disagrees.

Priest alleges that he was unable to communicate with Defendants Grazier and Fenwick due to his diabetic condition. *See* Compl., at 2–3 ¶ 7, 10, 14. He further asserts that "[t]hroughout the encounter [with the officers], [his] hands can be seen above his head." *Id.* at 3 ¶ 17.  The dash camera footage reflects, however, that although Priest raised his hands several times, he did not maintain his hands above his head during the entire encounter. *See Hartman*, 685 F. App'x at 368 (citing *Scott v. Harris*, 550 U.S. 372, 380–81 (2007)) (holding that in considering video evidence attached to a plaintiff's complaint, "the court is not required to favor plaintiff's allegations over the video evidence" on a motion to dismiss).  Moreover, Priest avers, and the video reflects, that he had stopped his car, which was still running, in the middle of the road; he "was in an obvious state of distress," "suffering confusion," and behaving erratically.  Compl., at 2, 11 ¶¶ 6, 7, 10, 72–

73. This is "the type of pre-arrest investigation that the Fifth Circuit envisioned when it articulated the rule: officers are required to determine, in a matter of moments, whether they should allow a suspect to continue driving or make an arrest." *Schmidt v. Texas*, Civil Action No. H–08–cv–01696, 2009 WL 7808952, at *4 (S.D. Tex. Jan. 12, 2009) (granting state's motion to dismiss on plaintiff's claim that officers violated the ADA and RA, explaining that under *Hainze*, officers are not required to accommodate plaintiff's disability during a DWI traffic stop); *see also Bahl v. Cty. of Ramsey*, 695 F.3d 778, 785–86 (8th Cir. 2012) (affirming district court's entry of summary judgment in favor of city on plaintiff's claim that officer did not accommodate his disability during a traffic stop, where defendant "observed [plaintiff] driving through traffic against a red light at rush hour"—dangerous behavior posing a "high threat to public safety"—and plaintiff resisted defendant's efforts to identify plaintiff); *Bircoll v. Miami-Dade Cty.*, 480 F.3d 1072, 1083–84 (11th Cir. 2007) (holding that plaintiff, who was deaf, failed to state an ADA claim based on his contention that, during a DWI investigation, defendant-officer should have called an interpreter to help communicate with plaintiff, finding plaintiff's requested modification unreasonable given the safety concerns and ability to obtain accurate measurements of inebriation).

The court further observes that by their nature, Priest's allegations are inconsistent: he contends that he was "in an obvious state of distress and needed immediate medical care (Compl., at 2–3), yet he also argues that the exigent circumstances exception elucidated in *Hainze* would not apply in such a demanding circumstance. The scene Priest describes—a man parked in the middle of the road in a running vehicle, behaving erratically, unable to communicate, and in obvious distress—presents the type of exigent circumstances contemplated by *Hainze*. Although Priest argues that the *Hainze* exception is inapplicable because he did not have a weapon, the facts alleged show otherwise—a running automobile with an incoherent driver clearly constitutes a

24

danger (and potentially a weapon), and Defendants Grazier and Fenwick did not know, at the time, whether Priest possessed a weapon in the car. Moreover, the scene was not secured, and Defendants had not determined "that there [was] no threat to human life."[6] *Hainze*, 207 F.3d at 801. Courts in this circuit have correctly noted that "[t]he *Hainze* exception is applied narrowly"; however, it exists precisely for the circumstances pleaded herein by Priest—"situations that legitimately present a threat of imminent danger and [that] call for this sort of instantaneous decision-making." *Van Velzor v. City of Burleson*, 43 F. Supp. 3d 746, 758 (N.D. Tex. 2014) (citing several cases for support). Here, the court finds that Priest's factual allegations, even when viewed in the most favorable light, demonstrate the type of exigent circumstances described in *Hainze* and other cases where courts have found the ADA and RA simply do not apply.[7] *See, e.g.*, *Lincoln v. City of Colleyville*, No. 4:15-CV-819-A, 2016 WL 8710478, at *6 (N.D. Tex. Mar. 4, 2016) (granting city's motion to dismiss on plaintiff's ADA and RA claims, explaining that such statutes "do not apply in the face of exigent circumstances; nor do they apply to responses to reported disturbances, whether or not those calls involve subjects with mental disabilities, before the officers secure the scene and insure that there is no threat to human life"); *Schmidt*, 2009 WL 7808952, at *5; *see also Munroe v. City of Austin*, 300 F. Supp. 3d 915, 931–32 (W.D. Tex. 2018) (granting summary judgment in favor of city with respect to plaintiff's ADA claim where officers had not completed securing the scene and could not have known, in the heat of the moment, that

---

[6] Plaintiff posits that "[a]t no time did [he] threaten either Defendant Grazier or Defendant Fenwick, nor was [he] capable of making a threat." Compl., at 4 ¶ 30; *see* Pl.'s Resp., at 15. Thus, he claims, no exigent circumstances existed. Pl.'s Resp., at 15–16. The standard set forth in *Hainze*, however, makes clear that the ADA does not apply in emergency situations where officers have not had the opportunity to, *inter alia*, ensure "there is no threat to *human life*"—not just the life of the officers. 207 F.3d at 801 (emphasis added). As pleaded, Priest presented a danger to himself and others in the vicinity, as well as Defendants Grazier and Fenwick.

[7] Notably, Priest does not specifically plead any facts asserting the accommodation he believes Defendants Grazier and Fenwick should have provided. Instead, Priest vaguely alleges that Defendants "declined to exhaust any efforts to test and treat Priest" and denied Priest "adequate medical services and programs available to others that would have prevented his injury." Compl., at 11–12 ¶¶ 75–76. Priest also again generally avers that the City failed to adequately train its officers to distinguish between medical and drug-induced emergencies. *Id.* at 5, 10–11.

plaintiff's BB gun was not a threat to their safety); *DeLeon v. City of Alvin Police Dep't*, Civil Action No. H–09–1022, 2010 WL 4942648, at *4 (S.D. Tex. Nov. 30, 2010) (granting summary judgment in favor of defendants on plaintiff's ADA claim, finding that defendants were not required to accommodate plaintiff's disability in light of exigent circumstances). Thus, the court finds that the facts as pleaded demonstrate the existence of exigent circumstances, and Priest's ADA and RA claims are therefore foreclosed by the Fifth Circuit's holding in *Hainze*. The court should dismiss such claims.

### C. Priest's claim for punitive damages against the City should be dismissed.

Priest seeks exemplary, or punitive, damages against the City, among other Defendants, for its alleged violations. Compl., at 12–13. Specifically, Priest alleges that "[a]s a direct, proximate, and producing cause and the intentional, egregious, malicious conduct by the Defendants, Plaintiff is entitled to recover exemplary damages in an amount within the jurisdictional limits of this Court." *Id.* at 13, ¶ 82.

The City argues that "[m]unicipalities are immune from punitive damages under both 42 U.S.C. [§] 1983 and the Tex. Civ. Prac. & Rem. Code § 101.024," and Priest is therefore not entitled to such relief. Def.'s Br., at 13. Priest did not address the City's argument in his response. *See* Pl.'s Resp., at 10–18. Existing law supports the City's position.

In private suits brought under the ADA and RA, punitive damages are not available. *See Barnes v. Gorman*, 536 U.S. 181, 189 (2001); *Edler v. Hockley Cty. Comm'rs Court*, 589 F. App'x 664, 671 (5th Cir. 2014) (noting that plaintiff is barred from recovering punitive damages under the ADA). Moreover, a plaintiff may not recover punitive damages against a municipality under § 1983. *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981) (holding that municipalities are immune from punitive damages); *see also Skyy v. City of Arlington*, 712 F.

App'x 396, 401 (5th Cir. 2017) (citing *Gil Ramirez Grp. v. Hous. Indep. Sch. Dist.*, 786 F.3d 400, 412–13 (5th Cir. 2015) and *Stern v. Hinds Cty.*, 436 F. App'x 381, 382 (5th Cir. 2011)) ("When this circuit has had occasion to address the issue of punitive damages against a municipality we have faithfully applied *City of Newport*, rejecting attempts to impose punitive damages for constitutional and other violations where Congress has not expressed a clear intention to do so."). Thus, to the extent Priest seeks punitive damages against the City under the ADA, RA, or § 1983, such claims should be dismissed with prejudice.

### D. Priest should be granted the opportunity to amend.

Although the undersigned recommends that the District Court grant the City's motion to dismiss, the undersigned also recommends that, in accordance with this court's practice, the District Court grant Priest the opportunity to amend his complaint. "[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal." *In re Am. Airlines, Inc., Privacy Litig.*, 370 F. Supp. 2d 552, 567–68 (N.D. Tex. 2005) (quoting *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002)). Here, Priest has not yet had the opportunity to file an amended complaint, it is not clear that the defects are incurable, and in his response, Priest requests that the court permit him to cure any defects in his pleadings. Pl.'s Resp., at 18. Thus, the undersigned recommends that the court provide Priest an opportunity to amend his complaint to plead a plausible claim against the City.

## V.   Recommendation

For the foregoing reasons, the undersigned **RECOMMENDS** that the United States District Court **GRANT** the City's Motion to Dismiss (ECF No. 10).  The undersigned further **RECOMMENDS** that the District Court grant Priest an opportunity to amend his Complaint.

## VI.   Right to Object

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within fourteen days after being served with a copy.  *See* 28 U.S.C. § 636(b)(1) (2016); Fed. R. Civ. P. 72(b).  To be specific, an objection must identify the specific finding, conclusion, or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's Findings, Conclusions, and Recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

Dated: May **30**, 2019

D. GORDON BRYANT, JR.
UNITED STATES MAGISTRATE JUDGE