IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| JOHN PRIEST, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 2:19-CV-004-Z-BQ |
| | § | |
| LOGAN GRAZIER, MICHAEL | § | |
| FENWICK, and CITY OF AMARILLO, | § | |
| | § | |
| Defendants. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

Pursuant to a Standing Order of Reference, this case has been referred to the undersigned United States Magistrate Judge for pretrial management, including decisions on non-dispositive matters and making findings and recommendations on dispositive matters. ECF No. 14. Before the Court for recommendation is Defendants Logan Grazier and Michael Fenwick's joint Motion for Summary Judgment based on qualified immunity, along with a brief in support and accompanying appendix. ECF Nos. 28, 29, 30. For the reasons explained herein, the undersigned recommends that the District Court **GRANT** Defendants' motion.

## I.    Background

On January 7, 2019, Plaintiff John Priest filed his original Complaint, asserting claims for violations under 42 U.S.C. § 1983, the Americans with Disabilities Act (ADA), and the Rehabilitation Act of 1973 (RA). Compl. 6–12, ECF No. 1. Priest named as Defendants the City of Amarillo (City) as well as Amarillo Police Department (APD) Officers Logan Grazier and Michael Fenwick. *Id.* at 1. The City moved to dismiss Priest's claims against it under Fed. R. Civ. P. 12(b)(6). ECF No. 10. The undersigned recommended that the District Court grant the

1

City's motion (ECF No. 21), and on October 3, 2019, the Court adopted the undersigned's findings. ECF Nos. 23, 24. Thus, Defendants Grazier and Fenwick (collectively, Defendants) are the sole remaining Defendants to this action.

With respect to his allegations against Defendants, Priest asserts that under 42 U.S.C. § 1983, Defendants used excessive force in violation of the Fourth Amendment during Priest's January 9, 2017, arrest. Compl. 6–7. Defendants raised the affirmative defense of qualified immunity in their Answers (ECF Nos. 6, 8) and thereafter filed the instant Motion for Summary Judgment. Through the motion, Defendants argue that they are entitled to summary judgment because: (1) they used objectively reasonable force given Priest's active resistance to arrest; (2) they did not know that Priest was suffering a medical emergency at the time of arrest; and (3) it would not have been clear to a reasonable officer that the force used was unlawful because Priest was resisting. *See* Defs.' Br. in Supp. 14–20, ECF No. 29 [hereinafter Defs.' Br.].

In response, Priest initially objects to Defendants' Appendix Exhibits B and C, arguing that they constitute inadmissible hearsay. Pl.'s Br. in Supp. 6, ECF No. 36 [hereinafter Pl.'s Br.]. Priest also maintains that although he was initially non-compliant, once he was "on the ground and not resisting," Defendants used unreasonable force by pushing his face into broken glass. *Id.* at 18. Priest further asserts that Officer Fenwick struck him three times with his fist and flashlight when he was not resisting, and Grazier kneed him in the back, after he "was on the ground and no longer resisting"—acts that Priest contends also constitute unreasonable force. *Id.* at 18–19. Citing Fifth Circuit case law, Priest avers that "it was clearly established in 2013" that Defendants' actions constituted excessive force. *Id.* at 22–25.

In their reply, Defendants first argue that Priest "takes liberties with summarizing the testimony of the [Defendants] that render his recitation inaccurate," and they review several of the

2

alleged mischaracterizations. Defs.' Br. in Supp. of Reply 3–6, ECF No. 39 [hereinafter Defs.' Reply]. Defendants further re-urge their argument that the material facts are not disputed. *Id.* at 6. Specifically, Defendants allege that the disputed fact issues Priest raises are merely "varying interpretations of events from differing viewpoints," which do not amount to "material disputes where the only relevant perspective . . . is that of an objectively reasonable police officer on the scene." *Id.* Defendants also argue that the Court should consider the video evidence—i.e., Defendant Grazier's dash camera footage—"over the arguments and interpretations of Priest and even the [Defendants]." *Id.* Finally, Defendants argue that the case law on which Priest relies in his response is distinguishable from the facts of this case. *Id.* at 7–9.

The parties have presented the following relevant summary judgment evidence:[1]

1. Deposition transcript of John Priest;

2. Deposition transcript of Corporal Logan Grazier, including a document labeled "Exhibit 12" (attached to Defendant Grazier's copy of his deposition transcript, Defs.' App. 222–23,[2] ECF No. 30);[3]

---

[1] As discussed in Section IV.A. below, the Court has not considered its findings, conclusions, and recommendation dated May 30, 2019 (ECF No. 21), or the order adopting such findings (ECF No. 23) as competent summary judgment evidence.

[2] Defendants did not paginate their Appendix as required by Local Rule 56.6. *See* N.D. Tex. Local R. 56.6(b)(3) (requiring that "[e]ach page of the appendix . . . be numbered legibly in the lower, right-hand corner"). Page citations to Defendants' Appendix therefore refer to the electronic page number assigned by the Court's electronic filing system.

[3] Priest did not object to Exhibit 12, which is titled "Case Summary Report" and was apparently authored by Defendant Grazier immediately following the January 9, 2017, incident. Defs.' App. 222–23 (Report concludes with "End of Report. CPL Grazier 1486 01/10/2017 0332 hrs."). The document appears to be a police report, which could be put into admissible form at trial—through the affidavit of a record keeper or Defendant Grazier's live testimony. Fed. R. Civ. P. 56(c); *see LSR Consulting, LLC v. Wells Fargo Bank, N.A.*, 835 F.3d 530, 534 (5th Cir. 2016) (quoting Fed. R. Civ. P. 56(c)(2)) ("At the summary judgment stage, materials cited to support or dispute a fact need only be *capable* of being 'presented in a form that would be admissible in evidence.'"). And although hearsay, it likely falls under at least two exceptions to Federal Rule of Evidence 803—Rule 803(6), the business records exception, and Rule 803(8), the public records exception. "In the Fifth Circuit, Rule 803(8) reports are presumed to be trustworthy and admissible; therefore, it is the burden of the party opposing admission to demonstrate a lack of trustworthiness." *Valentine v. Hodnett*, CIVIL ACTION NO. 5:14–CV–72, 2015 WL 12942069, at *3 (S.D. Tex. Sept. 16, 2015), *R. & R. adopted by* 2016 WL 806877 (S.D. Tex. Mar. 2, 2016). Priest has presented no argument suggesting that Exhibit 12 is not trustworthy or should otherwise not be considered. *See Hollie v. City of Bryan*, Civil Action No. 4:17-CV-3339, 2019 WL 2336931, at *1 n.1 (S.D. Tex. May 31, 2019) (citing *Bellard v. Gautreaux*, 675 F.3d 454, 461 (5th Cir. 2012) and

3

3. Deposition transcript of Officer Michael Fenwick; and

4. Dash camera video of January 9, 2017, incident.

## II.   Summary Judgment Standard and Qualified Immunity

Where the pleadings and evidence show that no genuine issue of material fact exists, the moving party is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[T]he substantive law will identify which facts are material." *Id.* The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the non-movant bears the burden of proving such material facts at trial, movants may satisfy their burden by either affirmatively showing the nonmovant's inability to establish such material facts or "merely demonstrat[ing] an absence of evidentiary support in the record for the non-movant's case." *Wesley v. Gen. Drivers, Warehousemen & Helpers Local 745*, 660 F.3d 211, 213 (5th Cir. 2011) (quoting *Bayle v. Allstate Ins. Co.*, 615 F.3d 350, 355 (5th Cir. 2010)).

A defendant's good-faith assertion of qualified immunity, however, alters the usual summary judgment burden of proof, "shifting it to the plaintiff to show that the defense is not available." *King v. Handorf*, 821 F.3d 650, 653 (5th Cir. 2016) (citations omitted); *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 419 (5th Cir. 2008) (holding that in summary judgment context, government official "need only plead qualified immunity, which then

---

*Whitehead v. Food Max of Miss., Inc.*, 163 F.3d 265, 275 (5th Cir. 1998)) (considering defendants' summary judgment evidence "despite the fact that many of the statements contained therein [were] arguably hearsay within hearsay," where plaintiffs did not object and could therefore be considered by the court).

shifts the burden to the plaintiff"). A plaintiff rebuts the defense by "establishing that the official's allegedly wrongful conduct violated clearly established law and that genuine issues of material fact exist regarding the reasonableness of the official's conduct." *King*, 821 F.3d at 654 (quoting *Gates*, 537 F.3d at 419); *Cass v. City of Abilene*, 814 F.3d 721, 728 (5th Cir. 2016) (confirming that a plaintiff seeking to overcome qualified immunity must show "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct" (internal quotation marks omitted)). To satisfy this burden, the plaintiff need not present "absolute proof," but must offer more than unsupported allegations. *Melton v. Phillips*, 875 F.3d 256, 261 (5th Cir. 2017) (citing *King*, 821 F.3d at 654). Specifically, the plaintiff must identify evidence in the record and show how it presents a genuine issue of material fact for trial. *Celotex*, 411 U.S. at 324; *White v. City of Dall.*, Civil Action No. 3:12–CV–2145–O(BH), 2013 WL 821972, at *3–4 (N.D. Tex. Feb. 13, 2013) (stating that once defendants have "carried their summary judgment burden by asserting their qualified immunity defense . . . [t]he burden . . . shifts to plaintiff to produce evidence showing that the defendants violated his constitutional rights" and the conduct was objectively unreasonable), *R. & R. adopted by* 2013 WL 840538 (N.D. Tex. Mar. 6, 2013).

A court should view the evidence in a light most favorable to the plaintiff (*Anderson*, 477 U.S. at 255); however, "a [plaintiff] cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or 'only a scintilla of evidence.'" *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)). A plaintiff "must allege facts specifically focusing on the conduct of [the defendant] which caused his injury." *Wicks v. Miss. State Emp't Servs.*, 41 F.3d 991, 995 (5th Cir. 1995). Moreover, where video evidence is available, the court may ignore a party's version of the

facts when that version "is blatantly contradicted by the record, so that no reasonable jury could believe it." *Scott v. Harris*, 550 U.S. 372, 380 (2007). "[A]lthough courts view evidence in the light most favorable to the nonmoving party, they give greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene." *Griggs v. Brewer*, 841 F.3d 308, 312 (5th Cir. 2016). In considering Defendants' motion, the Court must view all facts and inferences in the light most favorable to Priest and resolve any disputed material facts in his favor. *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005). Importantly, this Court must not make credibility determinations or weigh evidence in ruling on the motion. *Anderson*, 477 U.S. at 254–55.

Qualified immunity protects government officials performing discretionary functions from civil liability to the extent "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In deciding whether a defendant is entitled to qualified immunity, courts conduct a two-prong inquiry. Under the first prong, a court must decide whether the facts alleged, taken in the light most favorable to the plaintiff, show the officer's conduct violated a federal constitutional right. *Saucier v. Katz*, 533 U.S. 194, 200 (2001), *overruled in part by Pearson*, 555 U.S. at 236; *see Charles v. Grief*, 522 F.3d 508, 511 (5th Cir. 2008) (stating that a court must determine "whether the plaintiff has alleged a violation of a constitutional right"). Under the second prong, a court must determine whether the constitutional right in question was clearly established at the time of the alleged misconduct. *Saucier*, 533 U.S. at 201. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202. A court may address either prong first in light

of the circumstances particular to the case. *Pearson*, 555 U.S. at 236; *see Lytle v. Bexar Cty.*, 560 F.3d 404, 409 (5th Cir. 2009) (noting that "*Saucier*'s rigid 'order of battle'—requiring courts to always address the constitutional issue of whether alleged conduct violated the constitution—is now advisory under *Pearson*").

## III.    Factual Evidence Before the Court[4]

On January 9, 2017, at approximately 11:00 p.m., Defendant Grazier was on patrol when he observed a vehicle, which he later learned to be Priest's, stopped in the middle of the road in a high crime area, with the engine running and impeding two lanes of traffic. Dep. of Corporal Logan Grazier 17:25–18:25, ECF No. 37 [hereinafter Grazier Dep.]; Defs.' App. 222. As Defendant Grazier approached the vehicle, he observed two people walking away from Priest's car. Grazier Dep. 19:1–:9. The video shows that Grazier passed Priest's vehicle and then made a u-turn, pulling his patrol vehicle behind Priest's. Compl. Ex. A at 22:58:48–:59:15, ECF No. 1 [hereinafter Ex. A]. At that moment Priest pressed his brakes, as demonstrated by the flashing brake lights, and his vehicle began to move forward. *Id.* at 22:59:15–:30; Grazier Dep. 21:21–:22; Defs.' App. 222. Defendant Grazier initially thought that Priest would flee, but Priest stopped as Grazier turned on his emergency lights. Ex. A at 22:59:15–:30; Grazier Dep. 21:21. After stopping, Priest's vehicle straddled the dashed white line in the middle of the four-lane road. Ex. A at 22:59:31. Defendant Grazier exited his patrol car and tried to make contact with Priest. Grazier Dep. 21:10–:17; Ex. A at 23:00:17–:53. When he approached Priest's vehicle, Grazier

---

[4] Priest contends that at the time of the January 9, 2017, arrest he was suffering from a diabetic episode and therefore does not remember details of the incident. *See* Dep. of John Priest 47–48, 52:1–11, 92:5–14, ECF No. 37 [hereinafter Priest Dep.]; Pl.'s Br. in Supp. 6–7; *see also* Compl. 2 ¶ 7. Consequently, Priest has submitted no sworn affidavit to provide his view as to what happened during the use of force, but he did include his deposition testimony, which contains testimony regarding his understanding of events before and after the alleged constitutional violations. The facts stated herein come primarily from Defendant Grazier's dash camera footage and the deposition testimony of Grazier and Fenwick, as supplemented by Priest's deposition testimony and Exhibit 12, the Case Summary Report prepared by Defendant Grazier.

observed Priest "sitting in the driver's seat," "sweating profusely, shaking his head, just acting odd." Grazier Dep. 21:15–:17. Grazier tried to get Priest to roll down his window or open the door so he could speak with Priest—first by orally asking and then by tapping on the glass—but Priest did not respond; "[h]e would only shake his head 'no.'" *Id.* at 22:9–:17, 23:5–:10; *see* Defs.' App. 222. The video likewise reflects that Grazier tapped on the glass several times to get Priest to roll down the window, but Priest merely shook his head back and forth and rubbed his head repeatedly.[5] Ex. A at 23:00:23–:56. In his report, Defendant Grazier noted that "Priest was very jumpy" and grabbed "the gear shifter of the manual transmission vehicle" several times during the encounter. Defs.' App. 222.

As Defendant Grazier attempted to speak with Priest, Defendant Fenwick arrived and approached Priest's vehicle. *Id.* at 23:00:49; Dep. of Officer Michael Fenwick 24:5–:9, ECF No. 37 [hereinafter Fenwick Dep.]. Defendant Fenwick tried to open the front passenger door but it was locked, and Grazier continued his attempts on the driver's side. Ex. A at 23:01:07–:25. Priest did not try to drive away or otherwise flee during this time (Fenwick Dep. 32:8–:20); however, his vehicle's engine continued to run, and Priest continued to behave erratically, reaching toward his pockets several times and merely looking at Defendant Grazier when he tapped on the glass. Grazier Dep. 28:8–:9; Fenwick Dep. 30:17–:19; Ex. A at 23:01:00–:02:17.

After approximately two minutes and multiple attempts by the officers to communicate with Priest and get him to roll down the window or open the door, Defendant Grazier used his baton[6] to break the driver's side backseat window. Grazier Dep. 24:14–25:19; Fenwick Dep.

---

[5] Although the video contains sound, it appears that the sound was recorded from inside Defendant Grazier's patrol car. Thus, it is hard to hear much of Defendants' and Priest's conversations and verbal remarks when they are near Priest's vehicle.

[6] Defendants refer to the baton as an "asp." Fenwick Dep. 26:10–:11.

25:24–26:11; Ex. A at 23:02:33. The glass fell onto the pavement near the car. Ex. A at 23:02:33–:38. The video reflects that Priest's movements became more frantic—waving his hands near his face and rubbing his head repeatedly—after Defendant Grazier broke the glass and he apparently began to scream. *Id.* at 23:03:33–:48; Defs.' App. 222. Defendant Fenwick used his baton to unlock Priest's vehicle and then opened the driver's door. Fenwick Dep. 29:4–:9; Ex. A at 23:02:50–:03:06.

Defendant Fenwick reached into Priest's vehicle, unbuckled Priest's seatbelt, and pulled on Priest's right arm to remove him. Ex. A at 23:03:06–:15; *see* Fenwick Dep. 30:5–:8 (testifying that he reached across Priest and unbuckled the seatbelt). One of the officers ordered, "Get out of the car" (Ex. A at 23:03:14), and the officers struggled for a brief moment to remove Priest. Ex. A at 23:03:15–:19. The seatbelt caught on Priest's left arm as the officers pulled him from the vehicle, causing him to fall to the ground near the door on top of the broken glass.[7] Ex. A at 23:03:15–:21. The video reflects that the officers immediately placed their weight on top of Priest, who was lying face down. *Id.* at 23:03:19–:23. Defendant Fenwick testified that he did not think about Priest's placement on the pavement, but was focused solely on "prevent[ing] [Priest] from getting away . . . or pulling away from officers. And the quickest and safest way to do that was to [put Priest on] the ground immediately, outside the vehicle." Fenwick Dep. 34:23–35:8; *see also* Fenwick Dep. 35:17–:36:2 (stating that it would have been unsafe to roll Priest away from the glass).

---

[7] It is not entirely clear from the video whether Priest's face was pressed against the broken glass. Ex. A at 23:03:15–:21. Priest alleges, in his unverified Complaint, that Defendants pressed his face into the broken glass. Compl. 6–7. Defendants seem to concede that they pressed Priest's face into the broken glass. Grazier Dep. 31:3–:5 (acknowledging that Defendants placed Priest on the ground where the glass from the broken window had fallen); Fenwick Dep. 34:13–:15 (agreeing that Defendants pinned Priest to the ground, which "was covered in glass"). For the purpose of this motion, the Court takes Priest's allegation as true.

Once on the ground, Defendant Fenwick pressed his right knee into Priest's shoulder blade area and Defendant Fenwick pressed his right knee into Priest's lower body. Ex. A at 23:03:28; Fenwick Dep. 34:1–:12. The video shows Priest screaming and that he kicks his legs at least one time. Ex. A at 23:03:26–:04:29. Defendant Grazier attempted to place handcuffs on Priest and "was able to control his left arm fairly quickly." Grazier Dep. 34:14–:15; Ex. A at 23:03:37–:53. Priest's right arm, however, was underneath his body. Grazier Dep. 34:10–:12, :22–:24. As Defendants struggled to gain control of his right arm, Defendant Fenwick struck Priest with his right hand three times on Priest's left side, with several seconds lapsing between each strike.[8] Ex. A at 23:03:53–:04:02; Fenwick Dep. 41:3–:23; Grazier Dep. 35:6–:17. Following Fenwick's strikes, the officers secured Priest's right arm and handcuffed his wrists. Ex. A at 23:03:53–:04:33; Grazier Dep. 35:18–:20; Fenwick Dep. 42:5–:7. After the officers handcuffed Priest, he can be heard and seen on the video yelling and kicking his legs. Ex. A at 23:04:25–:33. At this point, Defendants realized that Priest's head was bleeding, and Defendant Grazier called for an ambulance. Grazier Dep. 35:21–36:10; Fenwick Dep. 58:12–:24; Ex. A at 23:04: The officers rolled Priest to his back and Defendant Grazier tried to sit Priest up. Ex. A at 23:04:33–:38. But Priest immediately leaned forward and away from Defendant Grazier, causing his body to move face-forward onto his right shoulder. *Id.* In response, Defendant Grazier kneed Priest one time

---

[8] Priest alleges that Defendant Fenwick struck him with his hand and a flashlight. *See, e.g.*, Pl.'s Br. 5, 8. Priest makes this allegation based on the following testimony of Defendant Fenwick:

> Q:    Was that flashlight in your hand when you delivered those strikes?
> A:    I do not recall.
> Q:    It's possible that it was?
> A:    It's *possible.*

Fenwick Dep. 56:9–:13 (emphasis added). Priest also cites the video evidence for support but the video merely reflects that *after* Defendant Fenwick struck Priest with his right hand, Fenwick held a flashlight (also in his right hand) to illuminate Priest. *See* Ex. A at 23:03:53–:04:10. The video footage does not clearly show, however, that Defendant Fenwick actually struck Priest with his flashlight, and Fenwick does not so admit. Because Priest has not submitted adequate competent summary judgment evidence showing that Defendant Fenwick struck Priest with a flashlight as well as his hand, the Court does not make such a finding.

near his buttocks and pulled him back into a more upright position.  *Id.* at 23:04:38–:56.

Defendants Grazier and Fenwick both put on disposable gloves, and then sat Priest into an upright

position while they awaited emergency care.  *Id.* at 23:05:07–:06:02.

     While they waited for the EMTs to arrive, Defendant Fenwick retrieved a first aid kit, and

Defendant Grazier applied pressure to Priest's facial cuts.  Ex. A at 23:06:38–:11:54.  Defendant

Fenwick searched Priest's person while he was seated on the ground; Fenwick apparently found

marijuana in one of Priest's pockets.  *Id.* at 23:09–:11:00; Defs.' App. 222; Priest Dep. 49:11–:12,

97:4–:9.  The paramedics then arrived and tended to Priest.  *Id.* at 23:11:54–:14:40.  Despite

behaving erratically and screaming during his encounter with Defendants, Priest remained still and

did not kick or scream as Defendants applied first aid and the paramedics evaluated and applied

gauze to his wounds.  *Id.* at 23:06:38–:14:40.

### IV.   <u>Discussion</u>

     Defendants Grazier and Fenwick move for summary judgment, alleging that qualified

immunity precludes Priest's excessive force claim.  Defs.' Br. 12.  Priest disagrees and points to

three specific acts that he alleges were unreasonable uses of force:  (1) Defendants' placement of

Priest on the ground on top of broken glass and pressing their weight into Priest as they handcuffed

him; (2) Fenwick's three strikes of Priest as Defendants handcuffed him; and (3) Grazier's knee-

strike to Priest's buttocks area after Priest was handcuffed.  *See* Pl.'s Br. 12.  Priest asserts that

with respect to each of these acts, a genuine issue of material fact exists as to "whether Priest was

resisting arrest and whether Defendants reasonably perceived Priest to be a threat," thus precluding

a grant of qualified immunity as to Defendants.  *Id.* at 12–13.  The Court will first address,

however, Priest's objection to portions of Defendants' summary judgment evidence, and then

examine whether Priest has met his burden to establish a material fact question exists as to each element of his claim sufficient to overcome Defendants' qualified immunity defense.

## A. Priest's Objection to the Evidence Should be Granted

Initially, the Court addresses Priest's objection to portions of Defendants' summary judgment evidence. In his response, Priest "objects to Defendant Appendix Exhibits B and C as they are Court Orders that amount to inadmissible hearsay." *Id.* at 6. To the extent Defendants merely point to the Court's discussion of the dash camera video in its findings, conclusions, and recommendation (FCR), the Court need not rule on Priest's objection because summary judgment proof (i.e., the video) independent of the FCR supports the Court's recommendation herein.

To the extent Defendants rely on the Court's FCR and the order adopting the FCR, which granted a motion to dismiss in favor of the City, as summary judgment evidence, their reliance is misplaced. *See* Defs.' Br. 16 (quoting the FCR dated May 30, 2019, in support of their argument that Defendants' actions were objectively reasonable). As clearly discussed in the FCR, the Court analyzed Priest's allegations within the context of a 12(b)(6) motion to dismiss. ECF No. 21, at 4–7. The Court accepted all of Priest's factual allegations as true to determine whether Priest had sufficiently pleaded claims against the City for failure to train as well as under the Americans with Disabilities Act (ADA) and the Rehabilitation Act of 1973 (RA). *Id.* at 2, 4. Although there may be overlap between the summary judgment evidence and the assumed facts referenced in the FCR (e.g., the video), the Court will not adopt the FCR findings as summary judgment evidence because such findings were made under the 12(b)(6) standard. Priest's objections should therefore be sustained. *See, e.g.*, *Pinder v. Skero*, 375 F. Supp. 3d 725, 736 (S.D. Tex. 2019) (explaining that plaintiff's reliance on court's order denying defendants' motion to dismiss in his summary

judgment response was misplaced because the "order [was] not a finding of fact nor [was] it summary judgment evidence").

### B. Defendants Have Met Their Burden of Raising the Qualified Immunity Defense in Good Faith

As outlined above, government officials seeking summary judgment on the affirmative defense of qualified immunity need only raise the defense in good faith; they need not present evidence to support the good-faith assertion. *Gates*, 537 F.3d at 419. Defendants raised the defense both in their Answers and in their motion for summary judgment, and they have proffered summary judgment evidence in support. *See* Def. Grazier's Original Answer 19, ECF No. 6; Def. Michael Fenwick's Original Answer 11, ECF No. 8; Defs.' Br. 6–7, 14–20. In addition, Defendants explain in their motion why they are entitled to qualified immunity: they did not violate Priest's constitutional rights and their conduct was objectively reasonable given the circumstances. Defs.' Br. 14–20.

By asserting the defense of qualified immunity, Defendants have carried their initial summary judgment burden. *See Gates*, 537 F.3d at 419. The burden now shifts to Priest to produce or identify evidence showing Defendants violated his constitutional rights and that the violation was objectively unreasonable under clearly established law at the time of the incident. *See Zarnow v. City of Wichita Falls*, 500 F.3d 401, 407 (5th Cir. 2007).

### C. Defendants are Entitled to Qualified Immunity

Priest's use of force claim arises under the Fourth Amendment because he was an arrestee at the time of the alleged incident. To sufficiently state an excessive force claim, a plaintiff must show that he suffered: "(1) an injury that (2) resulted directly and only from the use of force that was excessive to the need and that (3) the force used was objectively unreasonable." *Hamilton v. Kindred*, 845 F.3d 659, 662 (5th Cir. 2017) (quoting *Flores v. City of Palacios*, 381 F.3d 391, 396

(5th Cir. 2004)).  Courts consider the following non-exclusive criteria, known as the *Graham*

factors, in evaluating whether an officer's use of force is excessive or objectively unreasonable:

"the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of

the officers or others, and whether he is actively resisting or attempting to evade arrest by flight."

*Darden v. City of Fort Worth*, 880 F.3d 722, 728–29 (5th Cir. 2018) (quoting *Graham v. Connor*,

490 U.S. 386, 396 (1989)).  "The reasonableness of a particular use of force must be judged from

the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."

*Graham*, 490 U.S. at 396 (internal quotation marks omitted). "The calculus of reasonableness must

embody allowance for the fact that police officers are often forced to make split-second

judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount

of force that is necessary in a particular situation." *Id.* at 396–97.

### 1. *Defendants did not know that Priest was suffering from a medical emergency.*

As Priest acknowledges in his briefing, the evidence shows that Defendants were not

aware, until after the use of force, that Priest was suffering from a medical emergency.  Pl.'s Br.

6–7 (citing Grazier Dep. 22:23–23:4).  Thus, in applying the *Graham* factors and analyzing Priest's

claim below, the Court does not consider the apparent reason for Priest's erratic behavior—a

diabetic emergency—but only considers the facts that were known to Defendants at the time. *See*

*generally Cooper v. Brown*, 844 F.3d 517, 522 (5th Cir. 2016) (quoting *Graham*, 490 U.S. at 397)

("Our inquiry is whether the officer's actions were objectively reasonable in light of the facts and

circumstances confronting him, without regard to his underlying intent or motivation." (internal

quotations and alterations omitted)); *see also Wysong v. City of Heath*, 260 F. App'x 848, 850, 854

(6th Cir. 2008) (explaining that although the defendants later learned that plaintiff was suffering

from low blood sugar, defendants "could not have known at this point whether his odd behavior

arose from mental illness, intoxication, or criminal intent," and reasoning that if the plaintiff "was resisting arrest, even if his resistance arose from involuntary muscle spasms brought on by diabetes, the [defendants] did not use excessive force and certainly would be entitled to qualified immunity if they did").

### 2. Defendants' removal of Priest from the vehicle and their efforts to handcuff him were objectively reasonable uses of force.

Priest alleges, and the summary judgment evidence confirms, that he suffered injuries— i.e., multiple lacerations to his head and face—as a direct result of Defendants Grazier and Fenwick's use of force placing Priest on the ground on top of the broken glass. *See* Compl. 4 ¶ 31; Priest Dep. 53:10–:12, 55:24; Grazier Dep. 36:3–:9; Fenwick Dep. 45:1–:8. Thus, this Court need only determine whether the facts alleged, viewed in the light most favorable to Priest, show that his injury "resulted . . . from [a] use of force that was excessive to the need and that . . . the force used was objectively unreasonable." *Flores*, 381 F.3d at 396 (citing *Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir. 2000)). The Court applies the *Graham* factors to determine whether Defendants' removal of Priest from his vehicle and placement on the ground constitutes excessive force that was clearly unreasonable.

#### a. Severity of the Crime

Defendant Grazier observed Priest stopped in the middle of road with his engine running; the vehicle was impeding two lanes of traffic. Grazier Dep. 17:25–18:25; *see* Ex. A at 22:58:48– :59:31. Along with this traffic violation, Priest was behaving oddly (shaking his head, rubbing his head, screaming), did not coherently respond to Defendant Grazier, and reached toward the gear shifter and his pockets several times. Grazier Dep. 21:15–:17, 22:16–:22, 24:8, 28:8–:9, 29:25– :30:1, 32:9–:13; Fenwick Dep. 30:15–:19, 50:2–:3; Ex. A at 23:00:23–:56; Defs.' App. 222. Moreover, Defendant Grazier made numerous attempts to get Priest to roll down the window or

15

open the car door, but Priest refused to comply. *Id.* at 22:12–:17, 23:5–24:8; Fenwick Dep. 25:8–:23; Ex. A at 23:00:23–:56, 23:01:00–:02:17. Although the initial crime, a mere traffic stop, was not a serious offense, the Court finds that Priest's subsequent actions—including sitting in a vehicle with the engine running, screaming and rubbing his head, not responding coherently, reaching toward the gear shifter and his pockets, and disregarding multiple requests to roll down the window or open the door—not only justified the use of force but also elevated the degree or amount necessary to protect the public and ensure officer safety. *See, e.g.*, *Pinder*, 375 F. Supp. 3d at 740–41 (explaining that although plaintiff's initial crimes were not severe (traffic violation, suspected driving while intoxicated, and resisting arrest), "the combination of apparent intoxication, repeated noncompliance, pulling his hands away from [defendant's] grasp, and jerking his right arm back into a striking stance . . . transform[ed] a mere traffic stop into a more severe situation"); *Johnson v. City of Shreveport*, CIVIL ACTION NO. 17-0900, 2018 WL 3824380, at *3 (W.D. La. Aug. 10, 2018) (finding defendant's use of force was not excessive to the need in part because plaintiff was pulled over for driving recklessly and "refused to comply with the Defendant Officers' orders to lie on the ground"). Such circumstances, coupled with Defendant Grazier also observing two individuals walking away from Priest's vehicle in a high crime area, certainly support a reasonable and objective belief that Priest was intoxicated or otherwise acting with criminal intent.[9] *See* Defs.' App. 222; Grazier Dep. 19:1–:9, 21:15–:17. For these reasons, the Court finds that the first *Graham* factor favors Defendants' use of force.

---

[9] The Court also notes that Defendants searched Priest after he was handcuffed and found marijuana in his pocket. Priest Dep. 49:11–:12, 97:4–:9. Priest was ultimately charged with, and pleaded guilty to, possession of marijuana. *Id.* at 94:15–:19, 95:23–96:7; *see, e.g.*, *Darden*, 880 F.3d at 729 (citing *Orr v. Copeland*, 844 F.3d 484, 493 (5th Cir. 2016)) (noting that "drug crimes" can be "serious offenses").

### b. *Immediate Threat to Safety of Officers or Others*

In their deposition testimony, Defendants Grazier and Fenwick testified to several factors that made them believe Priest was a threat to them, the public, and himself. Defendant Grazier first observed Priest parked in the roadway, impeding two lanes of traffic, with the engine running. Grazier Dep. 18:14–:25, 21:21; *see* Ex. A at 22:58:48–:59:31. Priest was behaving erratically, screaming, unable to respond coherently, and failing to comply with orders. Grazier Dep. 21:15–:17, 24:8, 29:25–30:1; Fenwick Dep. 25:11–:15, :21; *see* Ex. A. at 23:00:23–:02:17. Defendant Grazier also saw Priest reach toward the gear shifter and both Defendants observed Priest reach toward his pockets multiple times and believed he might be reaching for a weapon. Grazier Dep. 29:25–30:1, 33:4–:8; Fenwick Dep. 30:15–:19, 50:2–:8; Defs.' App. 222. Considering the dash camera footage and the testimony of Defendants—the only competent summary judgment before the Court—the Court concludes that a reasonable officer would have perceived Priest as a threat to himself, the public, and the officers, particularly where Priest was noncommunicative, behaving erratically, refusing to comply with orders, had not yet been searched for weapons, and was sitting in a running vehicle—a potential weapon. *See, e.g.*, *Brothers v. Zoss*, 837 F.3d 513, 519 (5th Cir. 2016) ("A reasonable officer, moreover, could have perceived [plaintiff] as an immediate threat. As long as [plaintiff] remained in his pickup, he posed a potential danger to the officers and others."); *Breland v. City of Wiggins*, Civil No. 1:17cv276-HSO-JCG, 2019 WL 1281249, at *9 (S.D. Miss. Mar. 20, 2019) (finding that defendant had objectively reasonable grounds to believe plaintiff posed an immediate threat to officers' safety, where plaintiff dug through pockets of jacket, which had not been searched, and actively resisted defendant's efforts to confiscate and search the jacket, and plaintiff was also inebriated, belligerent, and behaving erratically); *Johnson*, 2018 WL 3824380, at *3 (noting that defendants were dispatched to the area in response to

gunshots fired and were not certain whether plaintiff was armed); *Clark v. City of Shreveport*, CIVIL ACTION NO. 15-2631, 2017 WL 7726739, at \*5 (W.D. La. Aug. 14, 2017) (concluding defendant's actions were objectively reasonable, where defendant "delivered two palm heel strikes to [p]laintiff's face" after plaintiff resisted and reached toward his waistband), *R. & R. adopted by* 2018 WL 934618 (W.D. La. Feb. 16, 2018). Thus, the second *Graham* factor supports a finding that Defendants' use of force was objectively reasonable.

### c. Actively Resisting Arrest or Attempting to Evade Arrest by Flight

The Court finds that the third *Graham* factor also weighs in Defendants' favor. Priest argues that the dash camera video "establishes that Priest did not resist." Pl.'s Br. 13–14. The Court disagrees and finds that the video patently contradicts Priest's assertion.

As discussed above, the video shows that Priest did not comply with Defendants' multiple attempts to communicate with Priest (by rolling down the window or opening the driver's side door). Ex. A at 23:00:17–:02:17. Defendants also testified that Priest never responded to them coherently. Grazier Dep. 22:9–:17, 23:5–:10; Fenwick Dep. 25:11–:15, :21–:23. Faced with a driver sitting in a running vehicle impeding two lanes of traffic who did not comply with orders and was behaving erratically, Defendant Grazier decided to break the driver's side back seat window to gain entry to the vehicle. Grazier Dep. 24:14–:23 (stating that he decided to break the glass because Priest "wouldn't comply," "wouldn't talk to [Grazier]," and "[t]here was no other option to get [Priest] to talk, and get out of the vehicle"). Defendant Grazier advised Priest he would break the glass. Fenwick Dep. 26:22–:24. Once Defendant Grazier broke the glass, Defendant Fenwick used his baton to unlock the driver's door, Fenwick reached across Priest to unbuckle his seatbelt, and one of the officers ordered Priest to exit the vehicle. *Id.* at 29:4–:5, 30:5–:8; Ex. A at 23:03:14

18

Defendants "responded with 'measured and ascending' actions that corresponded to [Priest's] . . . resistance"—verbal commands for approximately two minutes before physical entry and removal from the vehicle, and then forcible cuffing. *Poole v. City of Shreveport*, 691 F.3d 624, 629 (5th Cir. 2012) (quoting *Galvan v. City of San Antonio*, 435 F. App'x 309, 311 (5th Cir. 2010)). Defendants made numerous attempts to make contact with Priest, asking him to roll down the window or open the door. Because of his non-compliance, Defendants were left with no option but to forcibly remove Priest from the vehicle. *See, e.g.*, *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) ("Officers may consider a suspect's refusal to comply with instructions during a traffic stop in assessing whether physical force is needed to effectuate the suspect's compliance."); *Wertish v. Krueger*, 433 F.3d 1062, 1066 (6th Cir. 2006) ("When [plaintiff] finally stopped but failed to comply with orders to get out of his vehicle, it was objectively reasonable for [defendant] to pull [plaintiff] from the truck and handcuff him."). Defendants placed Priest on the ground, using their weight to help restrain him while putting on the handcuffs.

In faulting Defendants' actions, Priest asks the Court to focus on where Defendants placed Priest—on top of the broken glass. Defendants, however, faced a "rapidly evolving, volatile situation." *Galvan*, 435 F. App'x at 311. The "quickest and safest way to" prevent Priest from evading arrest, according to Defendant Fenwick, "was to [put Priest on] the ground immediately, outside the vehicle." Fenwick Dep. 35:6–:8. As Defendant Fenwick testified, he believed that rolling Priest away from the glass—to the extent Defendants were consciously aware Priest was on top of the glass—was "unsafe." Fenwick Dep. 35:21. Moreover, the video shows that Priest's left arm caught on the seatbelt, causing him to fall immediately near the vehicle—and the broken glass. Ex. A at 23:03:15–:21. Moving Priest, an uncooperative individual who was resisting arrest,

away from the glass would have provided him an opportunity to "break free or injure [himself] or injure any of the officers . . . ." *Id.* at 35:24–36:1.

Priest also contends that after Defendants removed him from the vehicle, "when [he] was on the ground," he did not resist, thus obviating the need for Defendants to place their weight on him. Pl.'s Br. 18. But at this stage, "[a] court must measure the force used under the facts as a reasonable officer *would perceive them*, not necessarily against the historical facts." *Griggs*, 841 F.3d at 313. The video reflects that Defendants briefly struggled to remove Priest from the vehicle (i.e., Priest did not exit the vehicle willingly), and thereafter struggled to handcuff Priest. Ex. A at 23:03:15–:04:33; *see* Fenwick Dep. 32:6–:7 ("When I tried to pull [Priest] out [of the vehicle], he pulled back in the vehicle."). The Court finds that, under the totality of the circumstances—a late-night traffic stop in a high-crime area involving an incoherent and erratically behaving person who shook his head no in response to multiple commands and directly ignored requests to roll down the window or open the door—"would, to a reasonable police officer, amount to resistance to arrest." *Id.*; *see Brothers*, 837 F.3d at 520 (noting that the approximate two minutes defendant officer spent negotiating with plaintiff before physical removing him from the running vehicle "was not objectively unreasonable, "especially in light of, *inter alia*, [plaintiff's] explicit and repeated refusal to comply with [defendant's] requests to exit the pickup and the possibility that [plaintiff] might have had access to a weapon" or could have attempted to flee in his vehicle); *Smith*, 295 F.3d at 771 (explaining that even accepting as true plaintiff's allegation that he did not actively resist arrest, "a reasonable officer who happened on the scene could reasonably misconstrue [plaintiff's] unresponsiveness [due to a diabetic episode] as resistance requiring the minimal use of force"); *Pinder*, 375 F. Supp. 3d at 743 (stating that plaintiff's refusal "to yield his hands," continued struggling with defendant while they were standing, and forcible resistance to

"all of [defendant's] attempts to gain control of the situation," could have led a reasonable officer to believe plaintiff was resisting arrest, despite the video showing that plaintiff "was not an active flight risk").

In sum, all three *Graham* factors weigh in favor of Defendants' use of force in removing Priest from his vehicle, placing him on the ground near his vehicle (which happened to be on top of the broken glass), and using their weight to contain and handcuff him. The Court therefore concludes that Defendants' removal and placement of Priest on the ground did not amount to an objectively unreasonable use of force.

### 3. Defendant Fenwick's three strikes to Priest as Defendants handcuffed him constitutes an objectively reasonable use of force.

Priest contends that as Defendants tried to handcuff Priest, Defendant Fenwick "punched [him] three times in the back and ribs." Pl.'s Br. 14. The evidence shows that Grazier had cuffed Priest's left hand, but Priest's right arm was underneath him. Grazier Dep. 34:10–:12; Fenwick Dep. 38:5. Priest argues that he was physically unable (rather than unwilling) to move his right arm because Defendants were pressing their weight on top of him. Pl.'s Br. 15. As a result of Fenwick's action, Priest alleges he "suffered injuries to his back and ribs." Pl.'s Br. 15 (citing Priest Dep. 53:1–:3, 87:5–:25).

As for the first *Graham* factor—the severity of the crime—the same reasoning applies as in Section IV.C.1.a. above. Moreover, despite being pinned to the ground by Defendants, Priest remained a threat to the officers—i.e., the second *Graham* factor. *See* Fenwick Dep. 36:3–:11 (testifying that Defendants did not have control of Priest after he was on the ground and Defendants were on top of him), 38:5–9 (stating that "[w]hen [Priest] refused to give control of his hands" Defendant Fenwick was unsure whether Priest was reaching for a weapon because Priest had not been searched). Priest was not yet handcuffed, nor had Defendants searched him for weapons.

21

*See, e.g.*, *Poole*, 691 F.3d at 629 (quoting *Deville*, 567 F.3d at 167) ("Because [plaintiff], upon refusing to turn around and be handcuffed, posed an 'immediate threat to the safety of the officers' and 'actively resist [ed]' the officers' instructions, the use of force was not 'clearly excessive.'"); *Rodriguez v. City of Grants*, CV 13-344 WPL/SCY, 2014 WL 12789669, at *3 (D.N.M. July 7, 2014) ("Because [plaintiff] would not allow himself to be handcuffed, he continued to pose an immediate threat to the safety of the officers and others."). Finally, although Priest alleges he was not resisting arrest as Defendants tried to handcuff him (*see, e.g.*, Pl.'s Br. 15), the video clearly shows that Defendant Fenwick struck Priest to get Priest to relinquish his right hand.[10] Ex. A at 23:03:53–:04:02; *see also* Fenwick Dep. 41:5–:7 (asserting that he struck Priest three times "[b]ecause [Priest] was pulling his hands away from [Defendants] and refusing to surrender control of his hands"). Defendant Fenwick delivered three measured strikes, with several seconds passing between each strike, although the video shows that the force was tempered, i.e., Fenwick did not rear his right arm back and hit Priest with full force.[11] Ex. A at 23:03:53–:04:02. After Defendant Grazier delivered the blows, Priest relinquished his right arm and Defendants handcuffed it. *Id.* at

---

[10] In support of his argument, Priest cites Defendant Grazier's testimony in which Grazier agreed that Priest's right arm "was pinned underneath the body weight of Mr. Priest, [Grazier], and Officer Fenwick." Pl.'s Br. 14–15 (citing Grazier Dep. 35:12–:17). But as Defendant Fenwick (the officer who applied the force) testified, he believed Priest was refusing to surrender his hands (Fenwick Dep. 38:5)—Priest "was not cooperating" and was resisting. *Id.* at 40:5–:6. Priest's argument that "it is clear from Grazier's dash camera video . . . that Priest tried to surrender his hand but was physically unable to move it . . . because the officers were holding him down on top of it" is likewise unavailing. Pl.'s Br. 15. Because Defendants' bodies block a clear view of Priest, many of Priest's actions are not visible, including his purported physical inability to move his hand. *See* Ex. A at 23:03:53–:04:33. And notably, Priest relinquished control of his right arm after Defendant Fenwick's three hand strikes. *Id.* at 23:03:53–:04:33; Grazier Dep. 35:18–:20; Fenwick Dep. 42:5–:7. Thus, the only competent evidence before the Court is Defendants' deposition testimony, which reflects that Defendant Fenwick believed Priest was refusing to give control of his right hand.

[11] This conclusion is further bolstered by Priest's allegation of harm related to the strikes—pain in his back and ribs, which did not require medical attention, and mental anguish. *See, e.g.*, Priest Dep. 53:2–:3, 87:7–:25; 89:22–90:5. Even assuming the pain in his back and ribs satisfies the "some injury" requirement, Priest's injuries related to Defendant Fenwick's strikes were not severe, indicating that whatever force Fenwick used, it was not unreasonable. *See Freeman v. Gore*, 483 F.3d 404, 416 (5th Cir. 2007) ("The determination of whether a plaintiff's alleged injury is sufficient to support an excessive force claim is context-dependent and is directly related to the amount of force that is constitutionally permissible under the circumstances." (internal quotations omitted)); *see also Wertish*, 433 F.3d at 1067 ("Moreover, because some force was reasonably required to arrest and handcuff [plaintiff], his relatively minor scrapes and bruises and the less-than-permanent aggravation of a prior shoulder condition were *de minimis* injuries that support the conclusion that [defendant] did not use excessive force.").

23:03:53–:04:33. Thus, all three *Graham* factors weigh in Defendant Fenwick's favor and counsel a finding that the hand strikes were objectively reasonable. *See, e.g., Bozung v. Rawson*, 439 F. App'x 513, 521 (6th Cir. 2011) (concluding officer used objectively reasonable force when he kneed plaintiff, who was on the ground, because plaintiff was not "neutralized" and defendant was still handcuffing him); *Wertish*, 433 F.3d at 1067 ("When [plaintiff] persisted in lying on his hands, it was reasonable to pull them forcibly behind his back, where they could be cuffed.").

### 4. Defendant Grazier's one knee strike to Priest after he was handcuffed does not amount to an objectively unreasonable use of force.

Priest lastly asserts that Defendant Grazier's one knee strike to Priest after he was handcuffed constitutes excessive force. Pl.'s Br. 16. According to Priest, "[w]hen Grazier struck [him], [he] was handcuffed with his hands behind his back, was laying on the ground, and was not resisting or being non-compliant." *Id.* Priest claims that "Grazier rolled [him] onto his side and kneed Priest's back." *Id.* The video, however, shows that Priest rolled to his side of his own volition; Defendant Grazier did not, either intentionally or unintentionally, roll Priest. Ex. A at 23:04:33–:38.

Turning to the *Graham* factors, the Court concludes that all three factors again weigh in Defendant Grazier's favor. As for the first *Graham* factor—the severity of the crime—the same reasoning applies as in Section IV.C.1.a. above. Second, although he was handcuffed, Priest did not remain still nor demonstrate compliance.[12] Ex. A at 23:04:38–:38; Grazier Dep. 37:11, 38:20–:22, 39:21–:23, 40:3–:5. Although handcuffed, Priest still posed a potential, albeit smaller, flight risk, either on foot or by attempting to return to his still running vehicle. Most importantly, however, Defendant Grazier testified that he perceived Priest as pulling away, i.e., continuing to

---

[12] Indeed, the video reflects that the first time Priest truly remained still was when Defendants applied first aid and the paramedics evaluated and applied gauze to his wounds. *Id.* at 23:06:38–:14:40.

resist. Grazier Dep. 37:10–:11, :16, 38:20–:25, 39:21–:23, 40:3–:5. Other than the video, Priest

has presented no summary judgment evidence to dispute Grazier's testimony. "Though it appears,

with benefit of hindsight, that" Priest *may* have rolled to his side because he was suffering a

medical emergency (as opposed to deliberately pulling away from Grazier), proper application of

qualified immunity analysis requires a finding that an objectively reasonable officer in Grazier's

position could have interpreted Priest's action as pulling away or resisting. *Carnaby v. City of

Hous.*, 636 F.3d 183, 188 (5th Cir. 2011); *see Guerra v. Bellino*, 703 F. App'x 312, 317 (5th Cir.

2017) (explaining that plaintiffs' assertion that the video did not definitively show decedent

"attacking" defendant "misapprehend[ed] the qualified immunity standard," which "requires that

an objectively reasonable officer in [defendant's] position believe [the plaintiff] posed a threat of

serious harm"); *Griggs*, 841 F.3d at 313 (explaining that although "a reasonable jury might find

that [plaintiff] was not *actually* resisting," based on "his testimony and the ambiguities in the

video," "proper inquiry" was a measure of the force used "under the facts as a reasonable officer

*would perceive them*, not necessarily against the historical facts"); *Hutcheson v. Dall. Cty.*, No.

3:17-CV-2021-BN, 2020 WL 1692950, at *15 (N.D. Tex. Apr. 7, 2020) (finding that defendants

were entitled to qualified immunity based on facts "[a]s depicted by the video and from the

perspective of a reasonable officer on the scene"); *Estate of Sizer ex rel. Sizer v. Cameron*, Cause

No.: A–15–CA–01143–SS, 2017 WL 2418316, at *10 (W.D. Tex. June 1, 2017) (finding second

*Graham* factor warranted officer's use of force where although decedent's resistance was mostly

passive, "the calculus of reasonableness depends on the totality of the circumstances as viewed by

a reasonable, on-the-scene officer without the benefit of retrospection," and defendant's testimony

reflected that she "possessed an objective and reasonable belief that [decedent] posed an immediate

threat to [the officers'] safety").

It is also important to note that, while the Court has analyzed the three uses of force separately (in the manner presented and argued by Priest), the use of force incident lasted roughly one-and-a-half minutes.[13]   The time that lapsed between Defendant Fenwick's last strike and Defendant Grazier's knee strike was approximately thirty-five seconds. Ex. A at 23:04:02–:38. After being cuffed, but before Defendant Grazier tried to sit him upright, Priest kicked his legs and screamed (Ex. A at 23:04:28); seven seconds later Priest rolled forward onto his shoulder and Defendant Grazier executed the knee strike. Ex. A at 23:04:38–:40. The short periods of time between these moments highlight the "rapidly evolving" nature of the entire incident. *See Graham*, 490 U.S. at 397; *Curran v. Aleshire*, 800 F.3d 656, 662 (5th Cir. 2015) (quoting *Poole*, 691 F.3d at 625–26) (acknowledging the Fifth Circuit has "repeatedly recognized" that "officers are afforded considerable latitude in 'tense, uncertain, and rapidly evolving' situations," particularly where a plaintiff is resisting at the time of the force).

Moreover, the entire incident arose because Priest stopped his vehicle in the middle of the road, was behaving erratically, and refused to comply with Defendants' orders. Defendants Grazier and Fenwick did not know, at the time of the uses of force, whether Priest was acting strangely because of intoxication, criminal intent, mental illness, or, as it turned out, a medical emergency.[14]  "As depicted by the video and from the perspective of a reasonable officer, the Court cannot find that [Defendant Grazier] used excessive force against [Priest] . . . ."[15] *Hutcheson*, 2020 WL 1692950, at *15.  Defendant Grazier's knee strike, even if questioned by an armchair

---

[13] As measured from the time Defendants removed Priest from his vehicle to termination of the force, as demonstrated on the video.

[14] As for Priest's possible intoxication, the Court observes that Priest's erratic behavior and refusal to acknowledge or respond to multiple inquiries and commands by the officers could certainly inform Grazier's reasonable belief that Priest was intoxicated.

[15] Similarly, Defendant Fenwick's hand strikes and the minimal injury Priest attributes to Defendant Grazier's knee strike also lead this Court to the inescapable conclusion that the force Grazier applied was reasonable.

quarterback not on patrol in a high crime area shortly before midnight, was not objectively unreasonable, particularly under the circumstances considered as a whole. *See Griggs*, 841 F.3d at 315 (quoting *Saucier*, 533 U.S. at 206) ("[Defendant's] actions [leg sweep and body slamming plaintiff, a "drunken, erratic suspect,"] may not have been as restrained as we would like to expect from model police conduct, but qualified immunity 'protect[s] officers from the sometimes hazy border between excessive and acceptable force.'").

With respect to all three uses of force, the Court has considered Defendant Grazier's dash camera video, Defendants' deposition testimony, and the relevant case law in reaching its decision. With no memory of the event in question, and consequently no affidavit attesting to his view of the situation, "to find for [Priest] would require this Court to find that the video raised an issue of material fact as to what a reasonable officer would do in the situation." *Pinder*, 375 F. Supp. 3d at 743. It does not. Under these circumstances, and based on the available evidence, the Court concludes that Priest has not shown that Defendants violated his constitutional rights—i.e., that a reasonable officer would not have perceived Priest as resisting and a threat to Defendants, thereby necessitating a use of force.

### 5. *Defendants' actions did not violate clearly established law.*

Even if Priest had met his burden of demonstrating that Defendants Grazier and Fenwick violated his constitutional rights, summary judgment would still be appropriate because Priest has not shown that the right at issue in this action was clearly established at the time of Defendants' alleged misconduct.

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that *every* 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563

U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (emphasis added). The law "must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (quoting *Saucier*, 533 U.S. at 202). "This requires a high degree of specificity." *Id.* In making such an evaluation, "courts must not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Id.* (internal quotation marks omitted). It is plaintiff's burden to "point to case law clearly establishing that [defendants] acted unreasonably based on facts similar to the particular circumstances they faced . . . ." *Hale v. City of Biloxi*, 731 F. App'x 259, 264 (5th Cir. 2018).

Priest has not carried his burden. Initially, he cites *Darden v. City of Fort Worth* for the proposition that "it was clearly established [at the time of the incident] that the degree of force that an officer can employ is greatly reduced when an arrestee is not actively resisting." Pl.'s Br. 22; *see Darden*, 880 F.3d at 731. Priest also relies on several other Fifth Circuit cases for the same proposition: it was clearly established at the time of the January 9, 2017, incident that using force, i.e., removing an arrestee from his vehicle and forcibly handcuffing him, striking him three times with fists, and executing one knee strike, against a non-resisting suspect who is not threatening officers or trying to flee, constitutes excessive force. Pl.'s Br. 22–25.

As discussed above, however, Priest *did* resist arrest. Before Defendants removed Priest from the car, he posed a danger and flight risk, and even after being removed he resisted handcuffing and refused to remain still. Thus, cases like *Darden* are distinguishable and inapplicable to the facts here.[16] *See Sam v. Richard*, 887 F.3d 710, 712 (5th Cir. 2018) (stating

---

[16] Because *Alexander v. City of Round Rock*, 854 F.3d 298 (5th Cir. 2017) was decided on a motion to dismiss, the Court finds it inapplicable.

that after officer ordered plaintiff to stop running, plaintiff "lay face down on the ground and put his hands on the back of his head," but defendant "slapped [plaintiff] across the face, kneed him, placed him in handcuffs, and shoved him against a police car"); *Darden*, 880 F.3d at 725–26 (summarizing that evidence showed plaintiff did not make threatening gestures or resist arrest before defendants threw him to the ground and tased him); *Hanks v. Rogers*, 853 F.3d 738, 746 (5th Cir. 2017) (explaining that plaintiff's "passive resistance"—facing away from defendant but displaying "his empty hands on the trunk of his car, on the back of his head, and then behind his back"—lead to conclusion that a reasonable officer would not have perceived plaintiff as an immediate threat); *Newman v. Guedry*, 703 F.3d 757, 760, 762 (5th Cir. 2012) (concluding that where plaintiff denied resisting arrest or failing to comply with commands and claimed that defendants "used force in response to nothing more than an off-color joke," and because video did not "discredit his allegations," defendants used objectively unreasonable force for purposes of summary judgment); *Deville*, 567 F.3d at 167 ("According to [plaintiff's version of events, her resistance was, at most, passive in that she merely refused to leave her grandchild and exit the vehicle until [her husband] came to get the child—not that she affirmatively, physically resisted as the officers contend."); *Bush v. Strain*, 513 F.3d 492, 496, 499, 501 (5th Cir. 2008) (finding that where plaintiff testified that *after* she stopped resisting arrest, defendant "grabbed her right hand, cuffed her, and then "placed his hand behind her neck and head and forced her face into the rear window of a nearby vehicle," plaintiff adequately pleaded constitutional violation at summary judgment stage and defendant was not entitled to qualified immunity). Moreover, the plaintiffs in the cases Priest cites were not behaving erratically and were communicative. *See, e.g.*, *Sam*, 887 F.3d at 712; *Darden*, 880 F.3d at 725–26; *Hanks*, 853 F.3d at 741–42; *Deville*, 567 F.3d at 161–63, 167–68. And, as Defendants note, the plaintiffs in the cases referred to by Priest provided

28

verified accounts of the incidents and/or the video bolstered their accounts. *See* Defs.' Reply 8–9.

The Court believes the inquiry in this case, properly framed, is whether case law clearly established in January 2017 that an officer cannot use non-deadly force to gain control of a non-compliant, erratically behaving, and actively resisting suspect. The answer is no, "there was no settled authority to put [Defendants] on notice that [their] use[s] of force in such circumstances violated [Priest's] constitutional rights." *Griggs*, 841 F.3d at 315. To the contrary, in October 2016 (less than three months prior to the incident here), the Fifth Circuit concluded in *Griggs*, a case with facts similar to those before the Court, that defendant's conduct—a "takedown maneuver . . . against a drunken, erratic suspect who [was] resisting arrest"—did not violate clearly established law.[17] 841 F.3d at 314. The Fifth Circuit further found in *Griggs* that the defendant's punching of plaintiff "several times while he was on the ground, as [defendant] attempted to handcuff him," was likewise not "unreasonable in light of clearly established law." *Id.* at 315.

Even with respect to the third use of force—Defendant Grazier's knee strike—the Court finds the law was not clearly established under facts similar to this case. For example, in *Griggs* defendant punched plaintiff after he was handcuffed in response to plaintiff kicking defendant in the chest. *Id.* The plaintiff argued that defendant's "punch was disproportionate to his kick and excessive because he was restrained in handcuffs," citing "caselaw that punching or otherwise gratuitously harming a restrained suspect constitutes excessive force." *Id.* at 315–16. The Fifth Circuit explained that although plaintiff accurately cited the principle of law, it did not have application to the facts of the case. *Id.* at 316. The court noted that plaintiff "was clearly *not*

---

[17] The Court acknowledges that there is no evidence that Priest was intoxicated at the time of the incident. Defendants did not know this, however, at the time of the incident, and Priest's behavior certainly suggested such a possibility.

subdued and under restraint; if he were, he would not have been able to physically assault [the defendant]." *Id.*

Although Defendants have not alleged that Priest harmed them in any way, *Griggs* is still instructive.  As explained above, the plaintiff in the case was behaving erratically and non-compliant—like Priest—and even after the plaintiff was handcuffed, he was not "subdued." Similarly, even after Defendant Grazier applied handcuffs, Priest did not remain still and made a move away from Grazier, which Grazier perceived as Priest pulling away from him.  The Court therefore finds the law was not clearly established at the time, i.e., that using non-deadly force to subdue a restrained, but still non-compliant individual, such that *every* reasonable officer would have understood that the conduct in question violated the law.  Stated alternatively, the record contains no summary judgment evidence demonstrating that *every* reasonable officer in Grazier's position would *know* that application of that degree of force under those circumstances would violate the Fourth Amendment.  *Morrow v. Meachum*, 917 F.3d 870, 876 (5th Cir. 2019) ("That means the law must be *so* clearly established that . . . every reasonable officer would know it immediately."); *see Pasco ex rel. Pasco v. Knoblauch*, 566 F.3d 572, 582 (5th Cir. 2009) (internal quotations omitted) ("Importantly, qualified immunity purposefully shields police officers' split-second decisions made without clear guidance from legal rulings[,] . . . protect[ing] officers from the sometimes hazy border between excessive and acceptable force, and . . . ensur[ing] that before they are subjected to suit, officers are on notice their conduct is unlawful.").

In sum, Priest has not met his burden of providing competent summary judgment evidence sufficient to create a genuine issue of material fact regarding Defendants' January 9, 2017, use of force.  Even viewing all facts in a light most favorable to him, as the Court must at this stage, Priest has failed to establish that Defendants acted unreasonably and unconstitutionally in light of clearly

established law.  The Court therefore finds that Defendants are entitled to summary judgment on the issue of qualified immunity.

## V.    Recommendation

For these reasons, the undersigned **RECOMMENDS** that the United States District Judge grant Defendants Grazier and Fenwick's Motion for Summary Judgment on the issue of qualified immunity.  ECF No. 28.

## VI.    Right to Object

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within fourteen days after being served with a copy.  *See* 28 U.S.C. § 636(b)(1) (2016); Fed. R. Civ. P. 72(b).  To be specific, an objection must identify the specific finding, conclusion, or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's Findings, Conclusions, and Recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

Dated: May 28, 2020

**D. GORDON BRYANT, JR.**
**UNITED STATES MAGISTRATE JUDGE**